**Earl J. TRAHAN, Jr. and Georgette N. Trahan**

v.

**BELLSOUTH TELECOMMUNICATIONS, INC.**

Civ. A. No. 93–0107.

United States District Court, W.D. Louisiana, Lake Charles Division.

April 4, 1995.

Karl E. Boellert, Lake Charles, LA, for plaintiff.

Wayne T. McGaw, South Central Bell Legal Dept., New Orleans, LA, for defendant.

## MEMORANDUM RULING

EDWIN F. HUNTER, Jr., Senior District Judge.

Presently before the court is the final installment in a series of motions for summary judgment filed by defendant, Bellsouth Telecommunications, Inc. ("Bellsouth"), which has resulted in the methodical and relentless dismemberment of plaintiff's case.

### Procedural History

This suit begin its checkered and troubled path over two years ago on January 19, 1993. In his petition, plaintiff, Earl Trahan, Jr., alleged several causes of action against Bellsouth, including, wrongful denial of disability plan benefits; wrongful termination; and actions under state law for intentional and negligent torts.[1]

On February 19, 1993, Bellsouth filed its first motion for summary judgment alleging that plaintiff's claims were preempted under the Labor Management Relations Act, ("LMRA"), 29 U.S.C. § 186, and/or under the Employee Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C. § 1001, et seq. In an April 29, 1993, order, we instructed plaintiff to delineate his state law causes of action so that we could compare them with the collective bargaining agreement, and determine whether they were preempted under the LMRA. In his supplemental brief, plaintiff was unable to specifically articulate his state law tort claims. Consequently, in our memorandum ruling issued on September 2, 1993, we interpreted plaintiff's petition as alleging intentional tort claims for 1) false imprisonment, 2) intentional infliction of emotional distress, and 3) defamation. In the same ruling, we held that plaintiff's state law negligence claims were preempted by the exclusive remedy provision of the Louisiana Workman's Compensation Laws. La.R.S. 23:1032 (1993). Finally, we held that plaintiff's cause of action for wrongful termination of benefits under Bellsouth's disability plan was preempted by ERISA.[2]

On September 21, 1993, Bellsouth filed a motion to clarify and to reconsider our September 2 ruling. The motion sought a determination that plaintiff's wrongful termination of employment claim was preempted under § 301 of the LMRA. Bellsouth also urged the court to reconsider its holding that plaintiff's intentional tort claims were not preempted by the LMRA. On October 13, 1993, we clarified our previous ruling, and held that Trahan's wrongful termination of employment claim was preempted under the LMRA. But we once again declined to extend the preemption to plaintiff's intentional tort claims.

On January 18, 1994, Bellsouth filed its second motion for summary judgment arguing that it was entitled to dismissal of plaintiff's ERISA claim. On March 16, 1994, we found that the administrative record contained substantial evidence confirming that the plan administrator did not abuse its discretion in terminating plaintiff's benefits. Accordingly, we granted Bellsouth's second motion for partial summary judgment, dismissing Trahan's ERISA claim.

Perhaps sensing the steadily increasing momentum in its favor, Bellsouth filed its third motion for summary judgment urging dismissal of Trahan's intentional tort claims for lack of evidence, or on the grounds of the well-worn, and twice-rejected, argument that plaintiff's intentional tort claims were preempted under the LMRA. We granted a series of continuances, and finally issued an order on October 12, 1994, holding Bellsouth's summary judgment motion in abeyance until pending arbitration proceedings were resolved. As of this writing, the arbitrator has yet to issue a ruling. On March 14, 1995, we sent a letter to the parties informing them of our intention to decide the pending motion for summary judgment within the next ten days. Not having received any protests to further defer resolution of these issues, we proceed with the following discussion.

1. Plaintiff's wife, Georgette, also has a claim for loss of consortium. Since this claim is necessarily dependent upon her husband's claim, we will refer to both plaintiffs in the singular.

2. We denied Bellsouth's motion for summary judgment to the extent it sought a finding that plaintiff's intentional tort claims were preempted by the LMRA.

### Historical Background

At this juncture of the proceedings, the court is well-versed with the facts and precipitating events of this law suit. Hence, we will focus our attention on the facts particularly related to the issues raised by this motion for summary judgment.

Trahan worked for twenty years with Bellsouth. At the time of the events giving rise to this law suit, Trahan was a services technician coordinating "locates" for telephone cables, to avoid potential damage caused by excavating contractors. In September, 1991, Bellsouth's security department received complaints that Earl Trahan was not performing his job competently, and possibly conducting personal business on company time.[3] After conducting an extensive and lengthy investigation, Bellsouth security confronted Trahan with their evidence. For most of the day on June 2, 1992, William "Bill" Reed questioned petitioner concerning the significant volume of witnesses and evidence which strongly indicated that Trahan was conducting a personal trucking business while on Bellsouth time. The following day, plaintiff claimed he was unable to go to work due to psychological trauma precipitated by the intense questioning. As of November 12, 1992, plaintiff still had not returned to work, and Bellsouth decided to discontinue plaintiff's tenure with their firm.

Trahan's only remaining claims are for defamation, intentional infliction of emotional distress, and/or false imprisonment surrounding the investigation leading up to and including the questioning on June 2, 1992.[4]

### Summary Judgment Principles

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part:

... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Rule 56(d) addresses the non-movant's duty in response to a motion for summary judgment:

... When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In interpreting Rule 56, the Supreme Court stated,

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue of material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The Fifth Circuit further elaborated:

We resolve factual controversies in favor of the non-moving party, but only when there is an actual controversy, that is when both parties have submitted evidence of contradictory facts. *We do not however, in the*

---

**3.** Trahan owned a trucking company, Trahan Trucking, which hauled dirt and limestone to construction sites.

**4.** Since our initial characterization of plaintiff's claims, Trahan has not identified nor brought to the court's attention any other intentional tort claims. Consequently, we deem any additional intentional torts abandoned.

*absence of any proof assume that the non-moving party could or would prove the necessary facts....* Moreover, the non-moving party's burden is not affected by the type of case; summary judgment is appropriate in *any* case "where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant."

*Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted) (emphasis in the original).

### Discussion

#### A. False Imprisonment.

 In Louisiana, the two essential elements of a false imprisonment claim are, "(1) the detention or total restraint of the person, and (2) the unlawfulness of such detention." *Rawls v. Daughters of Charity of St. Vincent De Paul, Inc.,* 491 F.2d 141, 146 (5th Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 513, 42 L.Ed.2d 307 (1974). For false imprisonment to occur, there must be, "a total and unlawful restraint of a person's freedom of locomotion." *Id.,* (citing, *Crossett v. Campbell,* 122 La. 659, 48 So. 141 (1909)). Moreover, a key factor in finding that there was total restraint, is whether the confinement was voluntary or involuntary. *Rawls, supra.* In *Crossett,* the Louisiana Supreme Court relied on the following excerpt, "One who submits to arrest and imprisonment rather than pay a small license fee, illegally exacted, but which he might have recovered back, without serious injury or damage, has no cause of action." *Crossett,* 48 So. at 143 (citation omitted).

At approximately 7:00 A.M. on June 2, 1992, plaintiff was told by his supervisor to cooperate with Bellsouth security in answering any questions they had. From 7:00 to 9:00 A.M., Trahan was questioned by Bill Reed and Wayne Pierce in a meeting room near his office. At 9:00 A.M., at the request of Bill Reed, Trahan accompanied the security team in Reed's car to Bellsouth's Fourth Avenue offices for further questioning. When later asked at his deposition whether he was physically prevented from leaving the room, plaintiff responded, "No, no one put their hands on me, no." However, when plaintiff went to his office to retrieve files or to the restroom, he was accompanied by a member of the security team. Later in his deposition, plaintiff elaborated about the nature of his alleged detention:

Q. Is the only restraint that you had placed on you by the Bellsouth employees your fear of losing your job?

A. No. It was stated later that it was a condition of employment. My remaining was a condition of employment.

Q. Right; and if you didn't remain, what would happen?

A. That I would be terminated.

Q. And that was your fear?

A. Yes.

Trahan deposition, page 71.

Plaintiff was further point-blankly asked if he was physically restrained from leaving the meeting room at the Fourth Avenue office. Plaintiff admitted that he was not physically restrained, but that if he wished to continue his employment with Bellsouth, he was required to remain and answer the security personnel's questions. Trahan's deposition, page 76.

Liz Verret, an official with the Communication Workers of America ("CWA") labor union, acted as Trahan's union representative during a portion of the questioning. She stated in her deposition that she, Trahan, and Ronnie Breaux, another CWA official, were permitted to go outside the building and discuss matters.

 Plaintiff does not dispute the fact that he was not physically restrained, nor that he did not fear the possibility of physical restraint if he attempted to leave the company premises. His sole fear was the threat of job loss if he did not remain. The Louisiana Supreme Court indicated in *Crossett,* that financial or economic restraint was not sufficient to constitute false imprisonment. *Crossett, supra; see also, Rougeau v. Firestone Tire & Rubber Co.,* 274 So.2d 454, 457 (La. App. 3d Cir.1973). Without some evidence of physical restraint or fear of physical restraint, we agree that plaintiff's complaint fails to support a claim for false imprisonment.

### B. *Intentional Infliction of Emotional Distress*

In 1991, the Louisiana Supreme Court recognized the tort of intentional infliction of emotional distress. *White v. Monsanto, Co.*, 585 So.2d 1205, 1209 (La.1991). The elements of an intentional infliction of emotional distress claim are, (1) that the defendant acted in an extreme or outrageous manner; (2) that the plaintiff suffered severe emotional distress; and (3) that the defendant either desired to inflict severe emotional distress, or knew that severe emotional distress was certain or substantially certain to occur from his conduct. *Id.* In defining conduct which is prohibited by this tort, the Supreme Court stated,

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*White*, 585 So.2d at 1209, (citations omitted). Moreover, "... disciplinary action and conflict in a pressure-packed work place environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable." *Id.*

At one point during the questioning, Trahan requested union representation. The questioning was paused until the union representative, Liz Verret, was brought into the room. Her notes reveal that she was brought in at 11:00 A.M. She remained with Trahan until Ronnie Breaux, another union representative who was more familiar with Trahan's line of work, relieved her. Verret's notes and testimony indicate that Bill Reed's questions were issued in a rapid-fire fashion. Verret implied that Reed's demeanor was generally calm, except when Reed lost his composure when Trahan suggested that he had been "bugging" Trahan's phone lines.

The only potentially inappropriate behavior exhibited by the security team which Trahan could identify, was that Reed engaged in a certain amount of sarcasm, ridicule, teasing, and taunting. As alluded to in *White, supra*, the occasional barb or jibe does not rise to the level of extreme or outrageous conduct. The evidence indicates that Bill Reed chided Trahan on only this one occasion. This does not amount to a pattern of harassment sufficient to constitute outrageousness. *See, White, supra*.

Possibly plaintiff's best argument relative the questioning, is its duration. The questioning began at 7:00 A.M. and did not conclude until 4:00 P.M. During that period there were interruptions for retrieving materials, transferring from one office to another, smoking breaks, a brief lunch break, and waiting for the union representative. From 4:00 P.M. to 7:30 P.M., plaintiff stood outside with his union representative, while security personnel prepared a written statement for plaintiff to sign.[5] Out of the nine hours of questioning, probably only seven, to seven and one half hours, were spent in actual question and answer sessions.

In *Netto v. Amtrak*, the Fifth Circuit found that the defendant, employer did not act outrageously or unconscionably when it interviewed its employee for possible wrongdoing while in a familiar environment, during regular working hours, with the union representative present, and with the interview spaced over reasonable time periods. *Netto v. Amtrak*, 863 F.2d 1210, 1215 (5th Cir. 1989). All those factors are present in this case except that the questioning was commenced and completed in one day. It is important to emphasize, however, that the questioning was broken up by smoking breaks and a lunch break. Rather than sustaining a finding of outrageous conduct, defendant's shortening of the questioning session to one working day spared plaintiff the

---

**5.** In the end, plaintiff declined to sign a statement.

uncertainty and fear of a prolonged investigation, which might have extended for days or weeks.

In sum, plaintiff has not met his burden in providing evidence which would support a finding that defendant's conduct reached the threshold level of outrageousness such as to be actionable under the tort of intentional infliction of emotional stress.

### C. *Defamation*

■ The elements of a defamation claim are: "(1) defamatory words; (2) publication; (3) falsity; (4) malice, actual or implied; and (5) resulting injury." *Cangelosi v. Schwegmann Bros. Giant Super Markets,* 390 So.2d 196, 198 (La.1980). Trahan's defamation claim is essentially two-pronged. Plaintiff's first assault focuses on statements allegedly made by Bill Reed to Trahan Trucking's customers and suppliers. Yet, when questioned at deposition concerning the alleged defamatory words communicated by Reed to others, Trahan responded that Reed had told potential informants that Trahan was under investigation for possible misconduct. Trahan deposition, pgs. 57–59. Trahan then admitted that if Reed had told others he was under investigation, that statement would be true. Trahan deposition, pg. 59. Plaintiff produced no evidence that Reed uttered false statements to Trahan Trucking's customers or suppliers.

■ The second phase of plaintiff's attack on defamation focuses on Reed's transmittal of the investigation results to others at Bellsouth. "A person may enjoy a qualified or conditional privilege in making a statement if it is made in good faith, on a subject in which he has an interest or duty, and to a person having a corresponding interest or duty." *White v. Baker Manor Nursing Home, Inc.,* 400 So.2d 1168, 1169 (La.App. 1st Cir.1981), *writ denied,* 403 So.2d 68 (La.1981). "Good faith" refers to a statement uttered with reasonable grounds for believing it to be true. *Elmer v. Coplin,* 485 So.2d 171, 177 (La.App.2d Cir.1986), *writ denied,* 489 So.2d 246 (La.1986).

■ In this case, security manager Reed had an interest in investigating possible misuse of company time by Trahan. Any other supervisors or Bellsouth employees that Reed may have transmitted the investigation results to, also would have had an interest in taking appropriate action against Trahan, or served as a warning for other employees engaged in similar misconduct. The only question is whether Reed had reasonable grounds for believing that Trahan was conducting a personal business on company time.

The investigative report compiled by Bill Reed from September 6, 1991 to July 20, 1992, is extensive. The report is forty pages long and includes statements from a plethora of business associates and competitors of Trahan Trucking. Even excluding the testimony of Curley Rogers[6] and Trahan's competitors, there is still ample and reliable evidence indicating the misuse of company time by Trahan.

For instance, C–D Utility Construction Company, Inc., was used by Bellsouth to perform locates for underground construction work. C–D Utility customarily received faxes from Earl Trahan regarding when and where to perform locates. C–D Utility's supervisor, Willis Champagne, stated that they were not receiving the locates far enough in advance, or that the starting times were changed without proper notification from Trahan. Champagne stated that he had seen Trahan Trucking's trucks at the Bellsouth work center, and observed that Trahan was receiving an inordinate amount of personal telephone calls and pages while Champagne was at the work center. Plaintiff has not identified, nor can we find any reason to question the veracity of the statements made by Champagne. Indeed, the statements were supported by facsimile records and other testimony by C–D Utility personnel.

Telephone traces were put into place by Bellsouth security on Trahan's work telephones which revealed that in one week's period 53 telephone calls were of an unofficial nature. The duration of the calls totaled 4.9 hours. Donna Ardoin, an employee of Dravo Basic Materials, stated that she contacted

---

**6.** Curley Rogers' deposition reveals that at best, his statements are dubious and unreliable.

Trahan three to five times each day on his pager (which was provided by Bellsouth) or to a "special number" at South Central Bell's office.[7]

In an attempt to question the good faith of Bill Reed, plaintiff points out that he had been investigated several times previously by Bellsouth security, and had the impression that Reed was "out to get him". Regardless of Reed's desire to have Trahan dismissed from Bellsouth, the charges that Trahan was conducting a personal business on company time are not baseless nor unsupported. As discussed above, there exists a substantial amount of evidence that Trahan was conducting a personal business on company time. The evidence is more than sufficient to provide reasonable grounds for believing that Trahan transgressed company policy. Consequently, Reed is entitled to the qualified privilege of communicating the apparent violation of company policy by Trahan to other Bellsouth officials. Plaintiff's defamation offensive falls short of its intended objective.

As an alternative ground for repulsing plaintiff's state law intentional tort claims, defendant once again tries to resurrect its LMRA preemption argument. This time, Bellsouth argues that the right of an employee to union representation preempts any state law claims arising from the representation. However, the facts indicate that as soon as plaintiff asked for union representation, it was promptly given to him. That is not an issue in this case.

Additionally, defendant argues that issues of overtime during the June 2 questioning, are governed by the CBA under Articles 3 and 4, and Appendix C, Part V. However, after examining these provisions of the CBA, we could not find any reference to overtime and security investigations, or what to do when there is a dispute as to overtime. Even if the CBA does govern overtime conflicts, this would only preempt the period from 4:00 P.M. to 7:30 P.M. when Trahan waited for the statement to be drawn up by Bill Reed. No known questioning took place during this period. We decline defendant's

invitation to exhume its LMRA preemption claim from its well-deserved, yet (based on the number of times it has attempted to resurface) shallow grave. This finding is in line with the Fifth Circuit's recent decision in *Baker v. Farmers Elec. Co-op, Inc.*, 34 F.3d 274 (5th Cir.1994). For the foregoing reasons, summary judgment is GRANTED in favor of defendant, BELLSOUTH, dismissing plaintiff's state law intentional tort claims.[8] We discern no additional claims in plaintiff's petition; the case is concluded.

THUS DONE AND SIGNED.

---

7. Presumably Dravo was a supplier of materials for Trahan's trucking business.

8. With the demise of Earl Trahan's claims, Georgette Trahan's loss of consortium claim necessarily suffers the same fate.