739 So.2d 830 (1999)
Rodney NICHOLAS, et ux., Plaintiffs-Appellees,
v.
ALLSTATE INSURANCE COMPANY, et al., Defendants-Appellants.
No. 30,735-CA.
Court of Appeal of Louisiana, Second Circuit.
May 28, 1999.
Rehearing Denied July 23, 1999.
*834 Wiener, Weiss & Madison by John M. Madison, Jr., Shreveport, for Appellants.
Cook, Yancey, King & Galloway by Jerald R. Harper, Shreveport, for Appellees.
Before NORRIS, WILLIAMS, GASKINS, CARAWAY and DREW, JJ.
GASKINS, Judge.
In this wrongful termination of employment action, the defendants, Allstate Insurance Company ("Allstate"), Larry Rhodes and William Monie, Jr., appeal the trial court judgment in favor of the plaintiffs, Rodney and Neva Nicholas. The jury found that Rodney Nicholas ("Nicholas") and Allstate had entered into an agreement which modified his at-will employee status, and that the defendants had breached the employment agreement and intentionally subjected Nicholas to emotional distress. For the following reasons, we affirm in part and reverse in part.

FACTS
In April 1971, Nicholas began working as an Allstate insurance agent in Shreveport, Louisiana. Prior to hiring Nicholas, Allstate gave him written materials and showed him a filmstrip, which explained the advantages of working with Allstate, and the potential to develop a substantial income from renewal commissions, relieving the pressure to generate new business in later years. Nicholas signed the Allstate R-830 "Agent Compensation Agreement," which described the agent's commission rates for new policies and renewals. The agreement also stated that either Nicholas or Allstate could terminate the contract upon giving written notice.
In 1981, after working as an Allstate agent for 10 years, Nicholas signed an *835 amended agreement. Part 4, paragraph XI, provides in pertinent part:
Either you or Allstate have the right to terminate this agreement upon mailing to the other, at his or its last known address, written notice of termination.... The Company will not terminate your employment because of unsatisfactory work unless you have been notified that your work is unsatisfactory and that your job is in jeopardy and unless you have been given a reasonable opportunity to bring your performance up to satisfactory standards.
The agreement does not define "unsatisfactory work" or "reasonable opportunity." During his time at Allstate, Nicholas received periodic performance reviews. Several of these evaluations noted that Nicholas needed to produce more insurance business.
In Allstate's Jackson, Mississippi region, which included Shreveport, there were three steps of review leading to an agent's termination. The first level was called Corrective Review, the second was Unsatisfactory Review, and the third was Personal, or "Job in Jeopardy," Review. If the agent failed to meet the goals of one level, he was placed at the next level and was eventually terminated.
In August 1984, Richard Ebbs, the Shreveport district sales manager, placed Nicholas on Corrective Review for poor performance, at the direction of William Monie, Jr. Monie was Allstate's Louisiana territorial sales manager, and at the time, Ebb's supervisor. Nicholas failed to meet all of the goals set for the first and second levels of review. In February 1985, he was placed on Personal Review and informed in writing that his job was in jeopardy. In April 1985, Monie moved to another region and Larry Rhodes became territorial sales manager. Nicholas achieved only one of the assigned insurance production goals, but this review period was extended an additional 30 days, with a new set of goals, because Ebbs had failed to meet regularly with Nicholas.
Following this review period, Nicholas had not achieved all of the assigned goals, but because he had improved his ranking among agents in his peer group, Ebbs initially suggested to Rhodes that Nicholas be removed from Personal Review. However, in a June 27, 1985 letter, Rhodes recommended the termination of Nicholas to the regional office, which gave its approval. Nicholas requested a hearing before the Agent Review Board to appeal this recommendation. He selected two members of the board, which voted unanimously to uphold the termination recommendation. Nicholas was terminated on October 14, 1985.
In November 1992, the plaintiffs, Rodney and Neva Nicholas, filed a petition for damages against the defendants, alleging breach of contract, fraud, intentional infliction of emotional distress, and detrimental reliance. Prior to trial, the defendants filed a motion for summary judgment on the issue of liability, and a motion to dismiss the punitive damages claim. The defendants also filed three motions in limine to exclude certain testimony and evidence. All of the motions were denied.
After a 17-day trial, the jury returned a verdict in favor of the plaintiffs, finding that Nicholas and Allstate modified their at-will status by agreement, that Allstate breached this agreement, and that Allstate's breach was committed in bad faith. Further, the jury found that the defendants intentionally inflicted emotional distress on Nicholas, which was a substantial factor in causing him damages. The jury also found the defendants breached a duty to Nicholas by intentionally and fraudulently misrepresenting the truth. Finally, the jury found that Nicholas detrimentally relied on promises made by Allstate.
The issue of prescription was also presented to the jury, which found the plaintiffs were unaware of the facts forming the basis of this claim until November 3, 1991, concluding that the claim had not prescribed. *836 The jury awarded damages in favor of the plaintiffs and against Allstate, Monie, and Rhodes in the designations of $440,000 for loss of salary or commissions, $159,000 for loss of retirement benefits and $850,000 for emotional distress and loss of enjoyment of life. The jury also awarded Neva Nicholas $15,000 for loss of consortium. The defendants appeal the judgment.

EMPLOYMENT CONTRACT
In two assignments of error, the defendants contend that the trial court erred in instructing the jury concerning the "at-will" employment issue, and that the jury was clearly wrong in finding that the parties' employment contract modified Allstate's right to terminate Nicholas. The defendants argue that Allstate is not liable for wrongful discharge because Nicholas was an at-will employee.
Ordinarily, the meaning and intent of the parties to a written instrument should be determined within the four corners of the document, and its terms cannot be explained or contradicted by extrinsic evidence. Brown v. Drillers, Inc., 93-1019 (La.1/14/94), 630 So.2d 741; NAB Natural Resources v. Willamette Industries, Inc., 28,555 (La.App.2d Cir.8/21/96), 679 So.2d 477. When a contract may be construed from the four corners of the instrument, that interpretation is a matter of law for the court to determine. NAB Natural Resources, supra; Wilson v. Cost Plus of Vivian, Inc., 375 So.2d 683 (La.App. 2d Cir.1979).
In the present case, the parties stipulated that Nicholas was an at-will employee and the validity of the employment contract is not disputed. Thus, the issue before the trial court was the interpretation of the contractual provision regarding pre-termination procedures and whether it affected the relationship between the parties. The trial judge submitted this question to the jury by giving an instruction, which stated in pertinent part:
Reasons for termination of an "at-will" employee need not be accurate, fair or reasonable, unless the parties have contracted to limit their at-will relationship. Under Louisiana law, Rodney Nicholas was an "at-will" employee of Allstate Insurance Company. An issue for you to determine is whether Rodney Nicholas and Allstate contractually limited the "at-will" relationship.
However, as noted above, the inquiry regarding the nature of the parties' relationship is a matter of law to be determined by the trial court, which erred in allowing the jury to construe the contract's meaning. Consequently, on review, we must interpret the contractual terms as a matter of law.
Under Louisiana law, a contract is an agreement by two or more parties whereby obligations are created, modified or extinguished. La. C.C. art.1906. Four elements are required for a valid contract: (1) the parties must possess capacity; (2) their mutual consent must be freely given; (3) the contract must have a certain object; and (4) a lawful purpose. La. C.C. arts.1918, 1927, 1966, 1971; Keller v. Sisters of Charity of Incarnate Word, 597 So.2d 1113 (La.App. 2d Cir.1992).
In addition to these general contract principles, the Civil Code provisions concerning the hiring of laborers are contained in La. C.C. arts. 2746-2750. One may hire out his services only for a certain limited time, or for the performance of a particular enterprise. La. C.C. art. 2746. A person or business is free to dismiss a worker without assigning any reason and the worker is also free to leave without giving any reason or cause. La. C.C. art. 2747.
Thus, the two types of contracts for hire are the limited duration contract and the terminable at-will contract. Williams v. Touro Infirmary, 578 So.2d 1006 (La.App. 4th Cir.1991); Deus v. Allstate Insurance Co., 15 F.3d 506 (5th Cir. 1994), cert. denied, 513 U.S. 1014, 115 S.Ct. *837 573, 130 L.Ed.2d 490 (1994). Where an employee's job is for an indefinite term, the employment is terminable at the will of either the employer or the employee. Absent a specific contract or agreement establishing a fixed term of employment, an employer is at liberty to dismiss an employee at any time for any reason without incurring liability for the discharge. Deus, supra; Williams v. Delta Haven, Inc., 416 So.2d 637 (La.App. 2d Cir.1982).
Here, the employment agreement does not establish a definite term and thus may be terminated at the will of either party. The plaintiffs cite Williams v. Delta Haven, Inc., supra, and several other cases to support their argument that Allstate's ability to discharge Nicholas was modified by the contract provision regarding the pre-termination process. This court and other courts have previously stated that the right to terminate indefinite employment at will can be altered by a specific contract or agreement. Williams v. Delta Haven, Inc., supra; Morgan v. Avondale Shipyards, 376 So.2d 516 (La.App. 4th Cir.1979). However, the above quoted contract language does not promise to employ Nicholas for a specified term and does not modify the manner in which Allstate determines that an agent's performance has been "unsatisfactory." This term is not defined in the agreement, but is left to the subjective decision of the employer.
Neither the contract nor the evidence in the record indicates that the parties signed the agreement with the intent that Nicholas could only be fired for cause. Evidence was not presented to show that use of the subjective term "unsatisfactory work" was intended to create an objective standard by which to measure an agent's sales performance. In addition, the evidence did not demonstrate that Allstate's three-step termination process modified the employment status of Nicholas so as to obligate Allstate to apply an objective standard or show a cause for dismissal.
In effect, the contract clause at issue gives the employee an advance warning of the employer's proposed exercise of its right to terminate at will, and provides an opportunity for the worker to meet the employer's standards for satisfactory work if he desires to remain employed. Under the agreement, Allstate decides when an agent's performance is inadequate or whether he has achieved the required degree of improvement. Thus, the contract provision did not alter the at-will status of the employment, since Allstate remained at liberty to discharge Nicholas for subjective reasons after informing him that his work was not satisfactory and deciding that his performance had not improved. Nicholas was also free to leave Allstate when he wished.
In their brief, the plaintiffs argue that Allstate breached the employment contract by failing to perform in good faith. La. C.C. art. 1759 provides that good faith shall govern the conduct of the obligor and obligee in whatever pertains to the obligation. Contracts must be performed in good faith. La. C.C. art.1983.
The duty to perform the at-will compensation agreement in good faith cannot be used to significantly alter the contract by requiring more than the terms of the agreement. Frichter v. National Life & Accident Insurance Co., 620 F.Supp. 922 (E.D.La.1985), affirmed, 790 F.2d 891 (5th Cir.1986). The evidence indicates that the notice and opportunity for improvement required by the terms of the contract were provided by Allstate. The plaintiffs' argument lacks merit.
The plaintiffs contend that Nicholas obtained a vested right to Allstate's promised benefit of notice and a reasonable opportunity for improvement. In support of their contention, they cite Knecht v. Board of Trustees for State Colleges and Universities and Northwestern State University, 591 So.2d 690 (La.1991), in which the supreme court stated that when an employer promises a benefit to employees, who accept by their actions in meeting the conditions, *838 the employees gain a vested right to the promised benefit.
However, the factual circumstances of Knecht, supra, can be distinguished from those in the present case. In Knecht, university employees were promised an hour of paid leave in return for an hour of overtime work for which they did not receive payment in wages. The court stated that the paid leave was a form of deferred compensation in lieu of wages, and once the employees rendered the services, the right to the promised remuneration vested. In contrast, this case does not involve such a deferred compensation arrangement. Nicholas was not working without pay in return for Allstate's promise to provide notice of unsatisfactory work and an opportunity for improvement. Further, Nicholas is not claiming the right to promised compensation which has been wrongfully withheld. The plaintiffs' contention lacks merit.
After reviewing the record and interpreting the contractual language in light of the applicable law, we conclude that the provision for notice and a period for improvement did not establish a fixed term of employment, and did not restrict Allstate's ability to determine solely in its discretion when an agent's performance was unsatisfactory and to decide that an employee had not achieved satisfactory improvement. Thus, the indefinite employment was terminable at the will of either party. Consequently, Allstate is not liable to pay damages for its discharge of Nicholas. Therefore, the jury's awards of $444,000 for lost income and $159,000 for lost retirement benefits as a result of Nicholas' termination are vacated.

PRESCRIPTION
The defendants contend that the plaintiffs' tort claims have prescribed. They argue that Nicholas possessed sufficient knowledge of his claim more than one year prior to filing suit.
Liberative prescription of one year for tort actions commences to run from the date the injury or damage is sustained. La. C.C. art. 3492. Damage is considered to have been sustained when it has manifested itself with sufficient certainty to support the accrual of a cause of action. Martin v. Kroger Company, 29,915 (La.App.2d Cir.10/29/97), 702 So.2d 347, writ denied, 98-0033 (La.3/13/98), 712 So.2d 881. Despite the statutory time limit imposed by Article 3492, our Louisiana jurisprudence has recognized a limited exception founded upon the civilian doctrine of contra non valentem, which suspends prescription until the plaintiff knows sufficient facts and has a reasonable basis for filing suit against a certain defendant. Chaney v. State Through Dept. of Health and Human Resources, 432 So.2d 256 (La. 1983).
In the present case, the evidence shows that at the time of his termination, Nicholas believed that the review system was unfair because he did not receive credit for some business he had obtained and he was not getting consistent information or assistance from Ebbs. Although Nicholas expressed concern about the membership of his peer group, he testified that he did not have a reason to disbelieve Ebbs' statement that Nicholas was last or tied for last in that group.
Despite his general suspicion that he was not being treated fairly, the testimony indicates that Nicholas did not learn until 1992 that his initial placement into the disciplinary review process may have been the result of an alleged ulterior motive of a supervisory Allstate employee, rather than his actual production. Constructive knowledge sufficient to start prescription involves more than mere apprehension that something might be wrong. Prescription does not run against a person who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful or unreasonable. National Union Fire Insurance Company of Pennsylvania v. Spillars, 552 So.2d 627 *839 (La.App. 2d Cir.1989), writs denied, 556 So.2d 61 (La.1990). Contrary to the defendants' assertion in their brief, the act of termination itself was not the sole basis of the alleged actionable tort, which also involved the activity of Allstate personnel leading up to the firing. The record contains testimony from which the trier of fact could have reasonably found that Nicholas did not know the facts upon which his tort claim was based until 1992. The assignment of error lacks merit.

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
The defendants contend that the trial court erred in finding sufficient evidence to support the claim for intentional infliction of emotional distress. They argue that because Nicholas was an at-will employee, he is precluded from asserting a claim for intentional infliction of emotional distress.

Law
To support their argument, the defendants cite Stevenson v. Lavalco, Inc., 28,020 (La.App.2d Cir.2/28/96), 669 So.2d 608, writ denied, 96-0828 (La.5/17/96), 673 So.2d 611, in which this court stated that an at-will employee's claim for intentional infliction of emotional distress could not be separated from the termination of his employment, where the worker alleged that his termination was wrongful, and constituted extreme and outrageous conduct. However, the circumstances of the present case differ from those in Stevenson, supra. Here, Nicholas alleges that the outrageous conduct of other Allstate employees occurred prior to his termination. Thus, the Stevenson limitation regarding the assertion of a tort claim is not applicable.
In order to recover for intentional infliction of emotional distress, a plaintiff must establish: (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that such distress would be certain or substantially certain to result from his conduct. White v. Monsanto, 585 So.2d 1205 (La.1991). The outrageous conduct requirement has been defined as conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. White v. Monsanto, supra; Stevenson, supra.
Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time. White v. Monsanto, supra; Maggio v. St. Francis Medical Center, Inc., 391 So.2d 948 (La.App. 2d Cir.1980), writ denied, 396 So.2d 1351 (La. 1981). The distress suffered must be more than a reasonable person could be expected to endure. The defendant's conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment or worry. White, supra.
The Louisiana Supreme Court has developed a two-part test for reversing a fact finder's determination. The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact, and then the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).[1]Mart v. Hill, 505 So.2d 1120 *840 (La.1987); Morehead v. Ford Motor Company, 29,399 (La.App.2d Cir.5/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/7/97), 703 So.2d 1265.
The duty of the fact finder is to evaluate credibility when testimony is conflicting and to accept or reject any part of a witness' testimony. Brister v. Continental Insurance Company, 30,429 (La. App.2d Cir.4/8/98), 712 So.2d 177. Credibility determinations, including the evaluation of expert testimony, together with the ultimate issue of whether a plaintiff has satisfied his burden of proof, are factual issues to be resolved by the trier of fact. Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880 (La.1993); Ferrell v. Minden Family Care Center, 30,088 (La.App.2d Cir.12/19/97), 704 So.2d 969, writ denied, 98-0392 (La.3/27/98), 716 So.2d 891. Where the testimony conflicts, the fact finder's reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even where the appellate court may feel that its own evaluations and inferences are more reasonable than those of the jury. Brister v. Continental Insurance Company, supra; Morehead v. Ford Motor Company, supra.

Evidentiary Rulings
The defendants further complain that the court made erroneous rulings that allowed in prejudicial evidence. The three areas in which evidence was wrongfully admitted, the defendants claim, included testimony about racial discrimination, low income "red-lining," and corporate security abuse.
James Ivy, Jr. was a sales manager in the Lafayette office in 1985. Ivy's deposition testimony focused mainly on a new program that Allstate was promoting in the 1980's to have the agents located in neighborhoods rather than in Sears department stores. Defense counsel questioned Ivy at length about his termination for sexual discrimination. Ivy responded that he felt that other employees would not have been fired in the same situation and that he had filed a racial discrimination suit based on the termination. The suit resulted in a settlement. The defendants protest the introduction of that portion of Ivy's deposition testimony which discussed his belief that his termination was based on race and the fact that he settled his suit. Ivy did not blame Monie for his termination, but did fault him for placing all the black agents together in a poor marketing area.
Daniel Korman, an Allstate top producer, was informed by an Allstate employee, whose conscience had bothered him for several years, that Korman was fired because Monie didn't like him. Korman had been chastised for writing policies in low-income areas. When Korman had inquired whether Allstate was illegally "redlining" certain areas, he was told not to sell policies in a certain zip code. This instruction came from supervisors other than Monie, and the testimony was unclear as to whether the supervisor understood it was improper to refuse to sell in areas that were predominantly low-income.
Ed DeLorenzo had been written up in a major magazine for being a "White Buffalo," or big producer. When Monie took over the Phoenix area, he told Korman that he had come to clean "from the top," which Korman took to mean that DeLorenzo was being targeted by Monie. It was rumored that Monie didn't like the fact that DeLorenzo earned more money than he did. DeLorenzo testified that Monie:
wanted to get everybody in line and shake them up, and my name was mentioned and basically if I went down, because *841 I had a lot of respect from a lot of the agents at that point in my career. And if I went down it's going to make a lot of people frightened. Take down the Big White Buffalo and then the rest will cringe.
Monie had corporate security interview DeLorenzo's clients and potential clients. This security interview had the effect of leading the clients to believe DeLorenzo was under investigation. DeLorenzo lost business and, ultimately, his mental health.
The defendants contend that the evidence regarding Monie's treatment of other agents and the testimony regarding red-lining and racial discrimination were not relevant and were prejudicial. They further submit that because the jury was so tainted, the verdict should be thrown out and this court should conduct a de novo review of the evidence.
Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Unless an exception is provided by law, all relevant evidence is admissible. La. C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403. Evidence of other crimes, wrongs, or acts may be admissible as proof of motive or intent. La. C.E. 404(B).
The circumstances of the DeLorenzo matter were closely related to those in this case. The acts of Monie in his supervisory techniques of DeLorenzo lend some insight into Monie's intent in the present case. While the statements made by other witnesses as to racial discrimination and redlining are not so closely related, these matters were responsive to the defendants' questions or were only briefly touched upon. These statements were not so prejudicial that error occurred by their admission into evidence.

Discussion
The review process of Nicholas began when Monie instructed all sales managers to send him the name of the worst agent in the peer group, so that he could put them on review to "stir things up from the bottom." Monie turned to Ebbs and said, "And Dick Ebbs, that agent in your district is Rodney Nicholas, I want his scalp on my tepee pole." Ebbs didn't consider this statement to be a serious one, so he sent in the name of another agent who was, in fact, the lowest producer. Monie contacted Ebbs, and instructed him to expand his review so that Nicholas became the worst in the peer group. Ebbs then compared the performances of the peer group agents in relation to 27 categories of insurance, showing Nicholas to have the least production overall.
Ebbs related that at an earlier meeting the agents had filled out a questionnaire about the managers' performance. Monie and his supervisor, Blankenship, received a complaint that they were unprofessional because they "dipped" and cursed during the meeting. Ebbs surmised that Monie thought that Nicholas, who was one of the religious agents in the Florida Street office, must have turned in the critical review.
There was also testimony that the Corrective Review process imposed on Nicholas was more onerous than reviews administered to other agents and he was required to produce business in lines of insurance that few other agents could sell. In addition, a Corrective Review which Ebbs purported to give to Nicholas on May 10, 1984, was later withdrawn because the regional office had not given prior approval and Ebbs had made several errors in computing the goals. An approved Corrective Review was administered to Nicholas on August 1, 1984, but his earlier production was not counted toward completion of the subsequent review's goals.
*842 In response to a customer complaint, Allstate personnel requested that corporate security investigate the financial records of Nicholas, who had failed to respond to a notice of cancellation of the customer's policy. This mistake by Nicholas required Allstate to pay the claim of another insurance company. Although the security office concluded that Nicholas' error was unintentional and did not involve dishonesty, Monie wrote to the regional office recommending that Nicholas be placed on Permanent Personal Review, so that another similar incident would result in his automatic termination. The letter purported to include Ebbs' signature, but he testified that he had not signed the document. Other testimony indicated that Monie may have signed Ebbs' name.
Nicholas complained that he wrote two homeowner policies which had disappeared and were ostensibly lost at the regional office. Monie reportedly referred to Nicholas and other low producing agents as "scum," and described their performance as "below the scum line." Monie, Ebbs and Rhodes at times told Nicholas that he was the lowest person in his peer group. Nicholas testified that such references caused him to feel "worthless" and that he felt humiliated and degraded. Nicholas stated that his morale was very low, that the review process was stressful and confusing, and that he did not understand what was happening.
Usually an agent's review was not a lengthy process, but the review of Nicholas lasted over a year. In April 1985, Rhodes replaced Monie, but the two shared an office. Even after Monie was no longer Nicholas' supervisor, evidence showed he still remained involved in Nicholas' Corrective Review process. Ebbs recommended to Rhodes that Nicholas be taken off the review process since the next step was termination. According to Ebbs, Rhodes seemed amenable to this suggestion but later Rhodes' attitude changed. Rhodes attributed this change to other Allstate executives. In early summer, Rhodes called Nicholas in from his vacation at church camp and notified him of his termination.
The issue presented for our determination on review is whether the foregoing testimony and other evidence in the record support the jury's finding that the defendants, Allstate, Monie and Rhodes, intentionally inflicted emotional distress on Nicholas. We must consider whether the plaintiffs satisfied their heavy burden of proving that the defendants' conduct was the type which subjects them to liability for this intentional tort.
We find the jury had ample evidence upon which to find that Monie's conduct towards Nicholas was extreme and outrageous; that the emotional distress suffered by Nicholas was severe; and that Monie desired to inflict severe emotional distress and knew that such distress would be substantially certain to result from his conduct. As Monie's conduct was performed in the course and scope of his employment, Allstate is likewise answerable for the intentional infliction of emotional distress. However, the record fails to support a finding that Rhodes' conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Certainly, summoning Nicholas from church camp to terminate him is reprehensible, but his actions do not support a finding of a pattern of deliberate, repeated harassment over time.
Finding that the jury's verdict was proper on the grounds of intentional infliction of emotional distress, we need not discuss whether the jury's finding of fraud and detrimental reliance were proper. Consequently, we pretermit discussion of the defendants' complaints on these grounds of liability.

GENERAL DAMAGES
General damages can involve physical or mental pain or suffering, inconvenience, *843 loss of gratification or intellectual or physical enjoyment and other factors that affect the victim's life and are by their nature damages which cannot be definitively measured in terms of money. Maynor v. Vosburg, 25,922 (La.App.2d Cir.11/28/94), 648 So.2d 411, writ denied, 95-0409 (La.4/28/95), 653 So.2d 590. In assessing damages in cases of offenses, quasi-offenses and quasi-contracts, much discretion is left to the trier of fact. La. C.C. art. 2324.1. Before an appellate court may disturb such an award, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case and the individual under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper. If the award is abusively low, it is raised to the lowest amount the trier of fact could reasonably have awarded. If the award is abusively high, it is reduced to the highest amount the trier of fact could have awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether the award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Graham v. Edwards, 614 So.2d 811 (La.App. 2d Cir.1993), writ denied, 619 So.2d 547 (La.1993); Manuel v. State Farm Mutual Automobile Company, 30,765 (La.App.2d Cir.8/19/98), 717 So.2d 277.
In the present case, the defendants argue that the general damage award to Nicholas is excessive. This case is similar to that presented in Guillory v. State Farm Insurance Company, 94-1405 (La.App. 4th Cir. 9/28/95), 662 So.2d 104, in which a plaintiff was awarded $350,000 in general damages where he suffered racial discrimination in his employment with an insurance company. The plaintiff in that case suffered mental anguish, stress, humiliation and went to a social worker for therapy 70 times.
In the case sub judice, Nicholas did not seek professional help for his depression, due in part to his financial situation. Dr. George Seiden, a psychiatrist, testified that the many physical complaints Nicholas suffered masked his depression. Further, Dr. Seiden stated that in the 10 years since the termination, the evidence is clear that Nicholas has been depressed most of the time, suffering major depression during some of that period.
Neva Nicholas, the plaintiff's wife, described how Nicholas would lie in bed in the fetal position, and how he was so full of fear as to be nonfunctional. She and her daughter feared Nicholas would commit suicide. Mrs. Nicholas described how her husband would suffer anxiety attacks, which caused them to rush him to the hospital fearing heart attacks. She testified that he still slept sitting up because he felt he was less likely to suffer an anxiety attack in that position than if lying down.
The emotional trauma has also impacted Nicholas' ability to earn a living. Dr. Seiden opined that the depression caused by the termination process contributed to Nicholas' inability to maintain employment. He noted Nicholas has had eight or nine jobs since 1985, whereas previously he held one job for 14 or 15 years. Dr. Seiden attributed this inability to hold a job to Nicholas' loss of self-confidence, his indecisiveness, and his uncertainty about what was right or wrong for him to do.
Mrs. Nicholas documented for the jury the financial difficulties the family had suffered since Nicholas' termination. She described how the utilities had been cut off several times and how their home had *844 come close to seizure more than once. Friends had helped out, by leaving boxes of food and giving money for stove repairs. Mrs. Nicholas took the stove repair money and bought Christmas for the children, cooking on one burner for seven more years.
Based on the emotional distress Nicholas has suffered since 1985, and the resulting emotional disability that prevents him from permanent, competitive employment, we find the award for general damages, while high, to not be in error.

PUNITIVE DAMAGES
In this case, the plaintiffs sought to recover punitive damages under Mississippi and/or Illinois law. Later, the trial court ruled that punitive damages were not applicable. However, during voir dire, the jurors were questioned regarding their willingness to enter a punitive damage award, if proven. The defendants argue that this preconditioned the jurors to punish the defendants and that the jury's damage award was tainted by improper references to punitive damages during voir dire. We reject this argument. We note that the trial court instructed the jury, close in time to their deliberations, that neither punitive nor speculative damages could be awarded. This proper instruction to the jury was sufficient to overcome any prejudicial effect which may have resulted in voir dire, which occurred approximately one month earlier.
We also note that the plaintiffs answered the appeal, objecting to the trial court's decision not to apply the law from other venues regarding punitive damages. Regarding conflicts of law on punitive damages, La. C.C. art. 3546 provides:
Punitive damages may not be awarded by a court of this state unless authorized:
(1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.
The plaintiffs concede that the resulting injury occurred in Louisiana. Louisiana law does not authorize the imposition of punitive damages under the facts of this case.
We find that the domicile of Allstate is determined by La. C.C. art. 3548 which provides:
For the purposes of this Title, and provided it is appropriate under the principles of Article 3542, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.
Accordingly, for purposes of this case, we find that Allstate is domiciled in Louisiana. Even if the injurious conduct occurred in Illinois or Mississippi, where punitive damages may be allowed, the resulting injury occurred in Louisiana and the tort-feasor is domiciled in Louisiana, a state in which punitive damages are not allowed.
However, the plaintiffs also urge application of La. C.C. art. 3542 which provides:
Except as otherwise provided in this Title, an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state in which the *845 relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
According to the plaintiffs, the law of the states of Illinois and Mississippi regarding punitive damages will be seriously impaired if we refuse to impose their provisions on that issue in this case. This argument is not convincing and we choose to follow the clear dictates of La. C.C. art. 3546 to decide this issue. Punitive damages may not be awarded in this case and the trial court was correct in so holding.

INTEREST
The defendants correctly argue that the trial court improperly awarded interest on the general damage award from the date of the breach of contract.[2] We find that the general damage award was for a tort claim; accordingly, interest on such awards runs from the date of judicial demand. La. R.S. 13:4203; Morris & Dickson Company, Inc. v. Jones Brothers Company, Inc., 29,379 (La. App.2d Cir.4/11/97), 691 So.2d 882, writ denied, 97-1259 (La.9/5/97), 700 So.2d 509. Therefore, we find that the legal interest on amounts awarded to the plaintiffs runs from the date of the judicial demand, November 4, 1992.

JUROR MISCONDUCT
The defendants assert that the trial court erred in denying the motion for mistrial they made after the jury foreman, an acquaintance of the plaintiffs' son, spoke to the plaintiffs' expert economist. The record reveals that, during a recess, this juror inquired of the economist whether he knew either of the economics professors who had taught the juror. The economist said he knew one of the professors. The juror then remarked that that professor was a good teacher, and the economist agreed. This was the entirety of their conversation. After denying the defendants' motion for mistrial, the trial court spoke to the juror outside of the presence of the rest of the jury and admonished him not to speak to witnesses. When the juror indicated that he had been under the impression that he was only forbidden to talk about the case, the trial judge clarified that the prohibition was against speaking to the parties, witnesses and attorneys on any subject. Also, the record during voir dire demonstrates that this juror attended school with the plaintiff's son; however, they were not close friends and they had seen each other infrequently since high school graduation. The defendants unsuccessfully challenged him for cause.
Improper behavior by a jury is not defined but must be determined by the facts and circumstances of the particular case. Bossier v. DeSoto General Hospital, 442 So.2d 485 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1122 (La.1984). The mere violation of a sequestration order does not compel that a mistrial be declared. Although misconduct of jurors may be a cause for granting a mistrial, the misconduct must be such that it is impossible to proceed to a proper judgment. Contact or communication between a juror and a party or counsel during the trial of a civil action may be sufficient ground for the declaration of a mistrial where it appears that the act or occurrence in question is potentially, or may have been actually, prejudicial to the complaining party. Jordan v. Intercontinental Bulktank Corporation, 621 So.2d 1141 (La.App. 1st Cir. 1993), writs denied, 623 So.2d 1335, 1336 (La.1993). Presumably, the same rule would apply to contact between a juror and a witness. In the instant case, it is apparent that the juror's conduct, while a technical violation of the judge's admonition not to speak to witnesses, was an unintentional error caused by a minor misunderstanding. *846 The defendants were not prejudiced by the juror's conduct, and the trial court did not abuse its discretion in denying the motion for mistrial.

CONCLUSION
For the foregoing reasons, the district court's judgment awarding Rodney Nicholas $444,000 for lost salary or commissions, and $159,000 in lost retirement benefits is reversed. The award of $850,000 for emotional distress and enjoyment of life in favor of Rodney Nicholas and the award of $15,000 in favor of Neva Nicholas, and against Allstate and William Monie, Jr., are affirmed. The finding of liability against Larry Rhodes is reversed. Interest shall begin to run from the date suit was filed. Costs are assessed to be paid one-half by the plaintiffs and one-half by the defendants.
AFFIRMED IN PART; REVERSED IN PART.
NORRIS, C.J., concurs in part and dissents in part.
WILLIAMS, J., dissents with written reasons.
CARAWAY, J., dissents with written reasons.
NORRIS, C.J., concurring in part and dissenting in part.
I respectfully concur in Judge Gaskins's opinion that affirms the damage award in favor of Rodney Nicholas and the loss of consortium award in favor of Neva Nicholas against Allstate and William Monie Jr. for intentional infliction of emotional distress.
I dissent, however, from reversing the awards in favor of Rodney Nicholas for loss of salary or commissions and retirement. I believe the R-830 agreement at issue in this case is a modified at-will employment contract. See, e.g., Williams v. Delta Haven Inc., 416 So.2d 637 (La. App. 2 Cir.), writ denied 421 So.2d 249 (1982); Morgan v. Avondale Shipyards, 376 So.2d 516 (La.App. 4 Cir.1979). Allstate admitted such a modification at oral argument; the evidence adduced at trial conclusively shows that the company not only believed this to be the case, but treated the contract as modified to restrict its right to terminate for unsatisfactory performance. Under this modification, when Allstate sought to terminate Nicholas because of unsatisfactory work, the company was obligated to give him notice and a reasonable opportunity to bring his performance up to satisfactory standards. Furthermore, Allstate was obligated to perform its obligations in good faith. La. C.C. arts.1906, 1918, 1927, 1966, 1971, 1983; Bond v. Allemand, 632 So.2d 326, 328 (La.App. 1 Cir.1993), writ denied 637 So.2d 468 (1994).
This record quite obviously shows that Allstate acted in intentional bad faith in seeking to terminate Nicholas for unsatisfactory performance and did not afford him a good faith effort to bring his performance to satisfactory standards. Thus, Allstate is guilty of a bad faith breach of its modified at-will R-830 contract. Damages for lost wages and retirement benefits are recoverable.
Furthermore, nonpecuniary general damages were proper for this breach of contract. La. C.C. art.1998. The record leaves no doubt that Allstate, by its bad faith breach of the contract, intended to aggrieve the feelings of Nicholas.
In sum, I would affirm the jury verdict and judgment of the trial court in its entirety.
WILLIAMS, J., dissenting.
Although in agreement with the majority's decision concerning the at-will employment contract, I respectfully dissent with regard to the issue of intentional infliction of emotional distress.
In a footnote, the majority mentions in passing that the jury was not provided with the definition of outrageous conduct set forth in White v. Monsanto, 585 So.2d *847 1205 (La.1991). The record shows that the parties requested that the trial court give a jury charge setting forth the elements necessary to recover for intentional infliction of emotional distress as stated in the White case. However, over the timely objections of the parties, the trial court declined to include such an instruction. Thus, the jurors were not provided with the correct standard by which to evaluate the plaintiffs' burden of proof and the nature of defendants' conduct with respect to this tort claim. Consequently, the lack of an instruction which provides a definition of intentional infliction of emotional distress that is consistent with White necessarily affects any assessment of the jury's finding and the weight given the verdict.
In concluding that the evidence is sufficient to support the jury's finding that Monie's behavior was outrageous, the majority refers to testimony describing several incidents of insulting or unfair treatment of Nicholas by the defendants. However, an appellate court is required to do more than simply review the record for some evidence which supports the trial court's finding. The reviewing court must evaluate the entire record to determine whether a reasonable factual basis exists for the jury's finding, and whether that finding is clearly wrong. Stobart v. State, Through DOTD, 617 So.2d 880 (La.1993).
Considering this standard of review and applying the analysis of White, supra, to the facts of the present case, I must conclude that the evidence contained in the record does not provide a reasonable factual basis for the jury's finding that the defendants' conduct, when viewed either in isolation or as a pattern, amounted to such extreme and outrageous conduct as to give rise to recovery for the intentional infliction of emotional distress.
The plaintiffs complain that Nicholas was not the lowest producer and did not deserve to be placed on Corrective Review. The evidence indicates that Nicholas was an average insurance sales agent. As an Allstate sales manager, Monie was interested in increasing the productivity of less active agents. The fact that he chose to focus on Nicholas for placement in the corrective review process may seem arbitrary, but not outrageous, particularly since a method of comparison indicated that Nicholas was one of the less productive agents. Similarly, Monie's use of the term "scum," which Nicholas acknowledged he did not hear directed at him personally, and the reference to Nicholas as the "lowest" agent in the peer group, while uncalled for, cannot reasonably be considered as beyond the bounds of decency.
Rhodes' written statement that Nicholas had "failed miserably" in his review performance was exaggerated, and Rhodes' act of having Nicholas called back from vacation to receive notice of termination appears insensitive. However, such behavior does not amount to the extreme and outrageous conduct necessary to allow recovery for intentional infliction of emotional distress.
Nor does the evidence establish that the defendants intended to inflict severe emotional distress on Nicholas. The majority and the plaintiffs emphasize the testimony of several witnesses as indicative of Monie's intent to inflict such distress. Ebbs' testimony suggests that Monie's intent in having Nicholas placed in the review process was to "stir things up from the bottom," so that other agents would be more productive. Plaintiffs presented testimony from Cliff Johnson, a former agent who retired from Allstate, who stated that he thought Monie had sought to make Nicholas an example to pressure other agents into joining the Neighborhood Office Agent program.
Such motives, while unsavory, do not primarily reflect a desire to inflict severe emotional distress. Disciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, are not ordinarily actionable. White, supra.
*848 In addition, the evidence does not indicate that the defendants knew severe emotional distress would be substantially certain to result from their conduct. Nicholas acknowledged that he did not inform any other Allstate employees about his anxiety. Nicholas testified that in response to defendants' conduct, he at times felt humiliated, anxious, confused, upset and worried. Such emotions, while sincere, are not sufficiently severe to establish the plaintiffs' right to recover damages for intentional infliction of emotional distress.
This court has previously considered the issue of whether a party's acts constitute outrageous conduct. The case of Smith v. Ouachita Parish School Board, 29,873 (La. App.2d Cir.9/24/97), 702 So.2d 727, involved a tenured teacher who was working as a guidance counselor when the school board demoted and moved her to another school for a position with few duties, causing her to feel depressed, embarrassed and ashamed. The school board later reassigned Smith to another school for a special education job, which included assisting with clerical duties. Smith also found this job humiliating. Subsequently, she was admitted to a hospital for treatment of depression. A psychologist opined that Smith's demotion and job-related stress had aggravated her pre-existing depression. This court found that although Smith's due process rights were violated, the school board did not engage in extreme or outrageous conduct in demoting Smith and placing her in various nonteaching positions.
After reviewing the entire record, I must conclude that the plaintiffs failed to satisfy their heavy burden of proving that defendants engaged in the type of extreme or outrageous conduct, as defined in White v. Monsanto, necessary to impose liability for intentional infliction of emotional distress. Nor does the record provide a reasonable factual basis for the finding that the emotional distress of Nicholas was so severe as to be more than a reasonable person could be expected to endure. Consequently, the jury was clearly wrong in finding that the defendants intentionally inflicted emotional distress on Nicholas. Therefore, the jury's award of general damages should be vacated.

Loss of Consortium
Neva Nicholas' claim for loss of consortium is derivative of her husband's damages. Ferrell v. Fireman's Fund Insurance Co., 96-3028 (La.7/1/97), 696 So.2d 569. Thus, in concluding that Rodney Nicholas is not entitled to recover damages for intentional infliction of emotional distress, I would also reverse the award to Neva Nicholas for her derivative claim of loss of consortium.
The majority states that because the jury's verdict concerning intentional infliction of emotional distress has been affirmed, a discussion of the jury's findings of fraud and detrimental reliance is unnecessary. However, the jury specifically found that fraud and detrimental reliance were substantial factors in causing damage to Nicholas. Presumably, these findings influenced the jury's decision to award $850,000 in general damages. Therefore, I will briefly discuss each issue.

Fraud
Fraud is a misrepresentation or a suppression of the truth made with an intention either to obtain an unjust advantage for one party, or to cause a loss or inconvenience to another. Ballard's Inc. v. North American Land Development Corp., 28,437 (La.App.2d Cir.6/26/96), 677 So.2d 648.
At trial and in their briefs, plaintiffs repeatedly allege that there was "manipulation" of the peer group analysis data. However, Ebbs testified that one could not manipulate an agent's production figures because the data was calculated by a computer at the regional office. Plaintiffs also complain that Ebbs improperly used 27 categories to "make it appear" that Nicholas was the lowest producing agent. The evidence indicates that these measurement categories were actual lines of insurance carried by Allstate, as shown by the List 60E and the Agent Growth, Profit Profile (AGPP).
*849 George Bishop testified that he independently verified the fact that with reference to the 27 measurement categories, Nicholas was the agent with the lowest production in the peer group. Although agents may not have been routinely evaluated with this number of categories, plaintiffs have failed to show that their use was fraudulent. There is no evidence that any of the defendants created or used false production numbers in the review process. Regarding the alleged forgery of Ebbs' signature, plaintiffs did not establish who signed the document, if indeed it was not Ebbs, or under what circumstances.
Plaintiffs contend that Allstate did not include some items of favorable information in Nicholas' personnel file. However, this file was "reconstructed" and the evidence does not establish that information was withheld due to fraudulent intent. Particularly in light of Allstate's ability to subjectively measure Nicholas' work performance and to dismiss him at will, the above-mentioned incidents cannot establish an intent to obtain an unjust advantage or to cause a loss of an assured job. Based upon this record, the evidence is insufficient to support the jury's finding that defendants engaged in fraudulent practices in regard to Nicholas' employment.

Detrimental Reliance
A party may be obligated by a promise when he knew or should have known that the promise would be relied upon by the other party, who was reasonable in so relying. LSA-C.C. art.1967. To recover under the theory of detrimental reliance, one must prove three elements: a representation by conduct or word; justifiable reliance thereon; and a change of position to one's detriment because of that reliance. Orr v. Bancroft Bag, Inc., 29,046 (La. App.2d Cir.1/22/97), 687 So.2d 1068.
During the trial and in their briefs to this court, plaintiffs argued that Allstate failed to perform several promises on which Nicholas relied. Plaintiffs assert that Allstate did not honor promises that Ebbs would assist Nicholas during the review process, and that he would receive credit for certain "lost" policies. Although Ebbs did not hold regular meetings, All-state responded by extending the Personal Review period for thirty days. Additionally, in several annual evaluations, Nicholas stated he did not need training, and at other times he received assistance in his sales strategy. The evidence also indicates that the lost policies were not located, so that credit could not be given. The record does not explain why photocopies of these policies were not available or why replacement applications could not be completed and submitted.
Nicholas signed the agent compensation agreement and worked as an Allstate agent. The plaintiffs have failed to establish that Nicholas made a change of position to his detriment either in reliance on the terms of the employment contract regarding an opportunity to improve, or in reliance on the CEO's promise regarding quotas. Thus, based on the above circumstances, the jury was clearly wrong in finding sufficient evidence of detrimental reliance.

CONCLUSION
For the foregoing reasons, the district court's judgment awarding Rodney Nicholas $850,000 for emotional distress and loss of enjoyment of life, and awarding Neva Nicholas $15,000 for loss of consortium, should be reversed. I would render judgment in favor of the defendants, dismissing plaintiffs' claims.
CARAWAY, J., dissenting.
In this case, the majority fails to distinguish between the ordinary emotional trauma of an employee's dismissal from employment and the intentional infliction of emotional distress which might be visited upon that same employee. There are two standards, somewhat in tension with each other, for measuring the employer's conduct.
On the one hand, an employer can be subjective, inaccurate, arbitrary, and unfair in the relations leading to dismissal of *850 an at-will employee who is not otherwise protected from discrimination by membership in a protected class. Stevenson v. Lavalco, Inc., 28,020 (La.App.2d Cir.2/28/96), 669 So.2d 608. See also, Louisiana's statutes restricting specific discriminatory practices in employment, La. R.S. 23:312 for reasons of age; La. R.S. 23:961, et seq. for exercising political rights; La. R.S. 23:965 for serving as a juror; and La. R.S. 23:332 for race, color, religion, sex or national origin. Emotional trauma results in varying degrees when employees go through downward spirals that result in involuntary dismissal. The words commonly used for termination, "firing" or "axed," reflect a general understanding of the unpleasantness of the situation. While this "ordinary" emotional trauma is not actionable, it surely can be extremely traumatic, embarrassing, and disheartening when the worst of an employer's uncaring subjectivity results in the unfair dismissal of an employee. The employee trusts during his employment in the general, moral duty that one should not be led on and that an employer should be forthright with the employee in the expectations regarding continued employment. Nevertheless, the employer's hiding of unfair assessments with inaccurate information regarding the dismissal process is not fraud or actionable bad faith. Our law chooses not to involve itself with the unfair and subjective treatment leading to these broken at-will relationships in a manner which is somewhat analogous to no-fault divorce. The law encourages freedom to easily part ways over disputes regarding employment relations.
On the other hand, an employer can intentionally inflict emotional distress upon an employee that amounts to an actionable tortious offense. White v. Monsanto Co., as cited by the majority, recognized this cause of action which may occur both inside and outside the workplace. The emotional distress suffered therefore by the victim must be the product of conduct which stands apart from the conflict and ill-feelings which accompany a subjective and unfair termination of an employee. White defined the conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." White v. Monsanto Co., 585 So.2d at 1209.
Most significant, the jury in the present case was never given White's "extreme and outrageous conduct" definition for the tort of intentional infliction of emotional distress. Instead, under a section of the jury instructions entitled "Fraud and Intentional Infliction of Emotional Distress," the jury was informed that they could award tort damages for Allstate's misrepresentation of the truth or failure to tell the truth to the plaintiff with the intention either to obtain an unjust advantage or to cause a loss or inconvenience to the plaintiff. Such instruction conflicts with the at-will employer's right to be deliberately inaccurate in the reasons for dismissal. Nevertheless, citing the manifest error doctrine, the majority now defers to the jury's finding of the tort of intentional infliction of emotional distress without that jury being informed of White's onerous test for extreme and outrageous conduct.
A case which illustrates the distinction between the expected trauma of employment termination and trauma caused by extreme and outrageous conduct is Dean v. Ford Motor Credit Co., 885 F.2d 300 (5th Cir.1989). In Dean, the Texas plaintiff brought a Title VII gender-based claim for her discharge from employment. She claimed that she and other women were not promoted and that she ultimately suffered a retaliatory discharge. The plaintiff's evidence showed that after she questioned her employer's promotion system she began to be called upon unfairly to do more work in unfamiliar work settings. She was also singled out and subjected to additional periodic job performance reviews. Her job performance was downgraded by these performance reviews and she was eventually informed that she would be released after a final 60-day evaluation if her performance did not improve. While the evidence outlined in the *851 opinion of the United States Fifth Circuit showed that an unfair and manipulative performance review process was visited upon the plaintiff over a lengthy period of time, the court ultimately affirmed the district court's ruling that the employer in the at-will employment relationship had grounds to dismiss the plaintiff and to refuse her promotion and that no Title VII violation had occurred. But this was not the end of the dispute.
As an additional claim, the plaintiff presented evidence of an outrageous incident that occurred in the course of her termination ordeal which she charged as intentional infliction of emotional distress by her employer. The evidence showed, and the jury found, that while she worked in the capacity of a cashier processing checks, one of her supervisors had placed endorsed checks into her purse in an effort to set her up for a charge of theft. Affirming the jury's verdict that this incident had caused the plaintiff severe emotional distress, the federal court applied the "extreme and outrageous" conduct test and ruled:
The fact that the "check incidents" occurred and that the defendant was responsible for them is precisely what takes this case beyond the realm of an ordinary employment dispute and into the realm of an outrageous one. Such conduct simply will not be tolerated. In support of its argument the defendant notes that it never accused the plaintiff of theft and that merely imputing careless work habits to a plaintiff is not outrageous conduct. The fact that the defendant did not accuse the plaintiff of theft is irrelevant. Merely causing the innocent plaintiff to be subject to such an accusation of crime and putting her in fear that it might come passes the bounds of conduct that will be tolerated by a civilized society and is, therefore, outrageous conduct.
Id. p. 307.
Despite the added element of the plaintiff's Title VII claim which was not available to Nicholas in this case, the analysis in Dean demonstrates that an employee at-will may continue in employment over an extended period of unfair abuse and suffer great trauma with the false hope that persisting with the abusive employer might somehow bring about change and fairness. That cumulative trauma suffered at her own volition by the employee, who can but does not leave the abusive environment, may not be redressed. Nevertheless, an outrageous act by the employer may occur which, even when measured outside of the emotional distress of the workplace, is a recognizable independent tort.
I see no independent tort "going beyond all bounds of decency" in Allstate's insensitive and subjective performance review and dismissal of Nicholas, an underperforming employee by most standards. For many years following his termination until informed by Ebbs in 1992, Nicholas apparently also missed the outrageousness of his employer's termination process. This reveals the final flaw in the majority's reasoning for the test for extreme and outrageous conduct. The various incidents which allegedly support a pattern and cumulation of outrageous conduct ending with Nicholas' dismissal in 1985 must have likewise had a severe emotional impact upon Nicholas in a manner sufficient to give notice in 1985 of the outrageousness of Allstate's action. If the church camp firing was reprehensible, Nicholas understood and experienced that outrageous and reprehensible event at that time without the need to be informed of Allstate's ulterior motives. In other words, the valid prescription issue raised by Allstate also goes to the substance of the claimed infliction of emotional distress. Just as with the crime or intentional tort of assault, had the victim, Nicholas, not realized he was assaulted in 1985, Ebbs informing him many years later does not then create an actionable claim. No claim ever existed. Thus, Nicholas' lack of timely prosecution of his claim is most telling of the lack of substance of the alleged tort.
The extreme and outrageous conduct for the tort of intentional infliction of emotional *852 distress must be clearly seen apart from the inevitable conflicts and emotions of employee/employer relations. Citing what Monie said in private about Nicholas' scalp and the corporate "scum line," the majority now attributes more significance to those comments than to the profane tirade which the White employees experienced first hand. White's test for extreme and outrageous conduct has been misapplied by the majority in the significant setting of at-will employment, and I respectfully dissent.

APPLICATION FOR REHEARING
Before NORRIS, C.J., WILLIAMS, GASKINS, CARAWAY and DREW, JJ.
Rehearing denied.
NOTES
[1] We note that the three-part test set forth in White v. Monsanto, supra, was not included in the jury instructions although all parties requested that instruction. The definition for intentional act was included, however. The record does not reveal why the instruction was later omitted and only a general objection was made to the omission; however, neither side appealed this omission. We find that the failure to include the White v. Monsanto test does not render the jury charges so incorrect or inadequate as to preclude the jury from reaching a proper verdict based on the law and facts. Gulf States Land and Development, Inc., v. Ouachita National Bank in Monroe, 29, 134 (La.App.2d Cir.4/4/97), 705 So.2d 189, writs denied, 97-1160 and 97-1199 (La.9/19/97), 701 So.2d 168. Consequently, we will review this issue under the manifest error rule.
[2] The defendants also complained that the interest on damages awarded for future salary and commission were erroneously computed, but these damages have been reversed.