765 So.2d 1017 (2000)
Rodney NICHOLAS, et ux.
v.
ALLSTATE INSURANCE COMPANY, et al.
No. 99-C-2522.
Supreme Court of Louisiana.
August 31, 2000.
Rehearing Denied October 6, 2000.
*1019 Dona Jeanne Dew, Douglas Lanaux Grundmeyer, John Francis Olinde, Chaffe, McCall, Phillips, Tolar & Sarpy, New Orleans, Mark Lane Hornsby, John M. Madison, Jr., Michael Allyn Stroud, Wiener, Weiss & Madison, Shreveport, for Applicant.
Jody Todd Benson, Bernard Slattery Johnson, Jerald R. Harper, Dr. Saul Litvinoff, Nicole Montagnet Smith, Shreveport, for Respondent.
Thomas Harry Kiggans, Baton Rouge, for Amicus Curiae, Louisiana of Business & Industries.
Leslie Weill Ehretr, New Orleans, for Amicus Curiae, Louisiana Society and Human Resource.
KNOLL, J.[*]
This case concerns an employee's suit against his employer and a supervisor for intentional infliction of emotional distress associated with his termination of employment. We wanted to examine the judgment of the appellate court which affirmed an award of $850,000 for emotional distress and loss of enjoyment of life, as well as $15,000 for loss of consortium, in light of our earlier pronouncement in White v. Monsanto, 585 So.2d 1205 (La.1991). We find that the appellate court erred in failing to find that the jury required specific instructions on the elements of liability recognized in White. After conducting a de novo review of the record in this limited regard, we reverse, finding that the evidence does not reach the high threshold for intentional infliction of emotional distress established in White.

FACTS
Rodney Nicholas ("Nicholas") began working on April 11, 1971, as an Allstate Insurance Company ("Allstate") agent in Shreveport, Louisiana. In its recruitment of Nicholas, Allstate presented him and his wife, Neva, with written materials and *1020 showed a filmstrip, "The Promise," which expounded upon the benefits of working for Allstate and explained his potential for earning substantial income from renewal commissions after he had developed a client base. Nicholas, who began his Allstate career as an agent in a booth at the Sears store in the St. Vincent Mall, signed an R-830 compensation agreement which outlined his commissions on new and renewal policies and further provided that either Nicholas or Allstate could terminate the agreement after giving written notice. Approximately ten years later on June 1, 1981, Nicholas signed an amended Allstate compensation agreement. The agreement maintained the right of either party to terminate after written notice. However, it further specified that Allstate would not terminate Nicholas' employment because of unsatisfactory work unless: (1) it notified him that his work was unsatisfactory and that his job was in jeopardy, and (2) he failed to upgrade his performance after being given a reasonable opportunity to improve.[1]
In Allstate's Jackson, Mississippi region, which encompassed Shreveport, a three-tiered review process preceded agent termination. At each level of review, Allstate particularized goals to be reached within certain time periods. Initially, an agent was placed on Corrective Review and, if the agent failed to meet the goals set, he was moved to Unsatisfactory Review. Finally, if the agent failed to remove himself from Unsatisfactory Review, he was placed on Personal, "Job in Jeopardy," Review.
Nicholas received annual performance reviews from Allstate, and on numerous occasions, Nicholas' district sales manager, Richard Ebbs ("Ebbs"), advised him that his production figures were not up to expectation. In August of 1984, Allstate's territorial sales manager, William Monie, Jr., ("Monie"), directed Ebbs to place Nicholas on Corrective Review for poor performance. After failing to meet the goals established for the first two tiers of review, Nicholas was placed on Personal Review on February 12, 1985, and was informed in writing that his job was in jeopardy. Although Nicholas only achieved one of the assigned insurance production goals in the initial period set for job in jeopardy review, the territorial sales manager extended Nicholas' review period by thirty days because Ebbs failed to regularly meet with Nicholas as outlined in Allstate's obligation to the agent during this process.
Each stage of Nicholas' review process was marked with Nicholas' failure to achieve all of the goals that supervisory personnel placed. Notwithstanding, Ebbs suggested to Larry Rhodes ("Rhodes"), the person who replaced Monie in April 1985 as territorial sales manager, that Nicholas be removed from Personal Review. After management rejected Ebbs' recommendation, Rhodes, with the approval of the Jackson regional office, recommended Nicholas' termination on June 27, 1985. This termination recommendation was then sent to Allstate's corporate headquarters in Illinois and was approved. After receiving notification of his termination, Nicholas requested a hearing before an Agent Review Board. This board was comprised of five members, two of whom Nicholas selected. After convening a hearing, the Agent Review Board unanimously voted to sustain Allstate's termination recommendation. On October 14, 1985, Allstate terminated Nicholas and paid him severance pay of $5,125.89.
In 1992, Nicholas learned of testimony that Ebbs gave in Deus v. Allstate Ins. Co., 800 F.Supp. 420 (W.D.La.1992), affirmed in part and vacated in part, 15 F.3d 506 (5 Cir.), cert. denied, 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994), another case involving a former Allstate agent's claim for intentional infliction of emotional distress. In that case, Ebbs testified that Monie singled Nicholas *1021 out for termination and manipulated the peer group against which Allstate compared Nicholas' performance. Nicholas and his wife sued Allstate, Monie, and Rhodes on November 4, 1992, alleging breach of contract, fraud, intentional infliction of emotional distress, and detrimental reliance.
Nicholas' trial against Allstate, Monie, and Rhodes extended over a period of 17days. The jury returned a verdict against the defendants on all four theories of recovery. It also determined the question of prescription adverse to Allstate, Monie, and Rhodes, finding that Nicholas and his wife were unaware of the underlying facts necessary to file suit until November 4, 1992. The jury assessed damages against all defendants, awarding $440,000 for loss of salary or commissions, $159,000 for loss of retirement benefits, and $850,000 for emotional distress and loss of enjoyment of life. The jury further awarded Neva Nicholas $15,000 for loss of consortium.
The Court of Appeal, Second Circuit, affirmed the jury's determination of the prescription issue as well as its award for emotional distress and loss of enjoyment of life, but reversed the awards for lost salary or commissions and for the loss of retirement benefits.[2]Nicholas v. Allstate Ins. Co., 30,735 (La.App. 2 Cir.5/28/99), 739 So.2d 830. The appellate court also reversed the jury's finding that Rhodes was liable with Monie and Allstate. Nicholas, 739 So.2d at 842.
The Nicholases and the defendants, Allstate and Monie, sought writs of certiorari to this Court. We denied Nicholas' writ application. 99-2537 (La.11/19/99), 749 So.2d 678. Thus, the judgment regarding the issues of Nicholas' lost salary or commissions, lost retirement benefits, and the reversal of Rhodes's liability is final. We granted the writ application of Allstate and Monie to address the issue of the tort of intentional infliction of emotional distress in this workplace setting. 99-2522 (La.11/19/99), 750 So.2d 208.[3]

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
Allstate and Monie contend that the lower courts erred in finding that their actions in the termination of Nicholas' employment with Allstate were sufficient to constitute the tort of the intentional infliction of emotional distress. Relying upon our decision in White v. Monsanto, 585 So.2d 1205 (La.1991), they argue that their conduct was not extreme and outrageous, that their actions did not cause Nicholas to suffer severe emotional distress, and that they neither desired to inflict emotional distress nor knew that severe emotional distress was substantially certain to follow their actions. They also contend that the trial judge erred in failing to give the jury specific instructions which would guide it through the elements enunciated in White.
As we recognized in White, the basis for the tort of the intentional infliction of emotional distress in Louisiana is LA. CIV.CODE art. 2315 as illuminated by the restrictions and guidelines enunciated in the American Institute's Restatement (Second) of Torts § 46.[4] Comment D of Restatement (Second) of Torts § 46 provides:
*1022 It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous!"
Drawing upon this background, we stated in White that:
[I]n order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.
White, 585 So.2d at 1209.
Applying that standard in White, we found no showing of extreme and outrageous conduct when a supervisor directed profanity at White and other workers who were sitting idly in the workplace. Although the supervisor threatened them with dismissal, referring to them and castigating them using base and vulgar four letter words, we found that such conduct did not constitute the tort of intentional infliction of emotional distress as described in the Restatement (Second) of Torts § 46 and our general provision for tort recovery, LA. CIV.CODE art. 2315.

Jury instruction for intentional infliction of emotional distress
In the court of appeal opinion, the majority noted in a footnote that although the litigants did not specify the adequacy of the jury instructions as an assignment of error, it observed that the three-part test of White was requested, but was not included. Despite this omission from the jury instructions, the appellate court found that this failure did not interdict the jury verdict because the trial court instructed the jury as to the defendants' liability for performing an intentional act whereby they "either desired to bring about the physical results of [their] act or believed that they were substantially certain to follow from what [they] did." Nicholas, 739 So.2d at 839 n. 1. Accordingly, the majority reviewed the lower court's resolution of the issue of intentional infliction of emotional distress under the manifest error rule. The two dissenting judges, relying on White's "extreme and outrageous conduct" definition for the tort of intentional infliction of emotional distress, stressed that the omission in the jury instructions was essential to the jury determination and should have necessitated a de novo review of the facts in light of the White definition.
This question requires us to perform a twofold inquiry: (1) should the appellate court have reached this issue even though it was not assigned as error;[5] and (2) if it should have reached this issue, was the omission of the White definition such that the jury charge was so incorrect or inadequate as to preclude the jury from reaching a proper verdict?
LA.CODE CIV. PROC. art. 2129 provides that an assignment of error is not necessary in any appeal. Moreover, LA.CODE CIV. PROC. art. 2164 provides that an appellate *1023 court "shall render any judgment which is just, legal, and proper upon the record on appeal." Likewise, UNIFORM RULES OF LOUISIANA COURTS OF APPEAL, RULE 1-3 provides that "[t]he Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise." (emphasis added).
It is clear that the defendants submitted very specific jury instructions which incorporated the White definition of intentional infliction of emotional distress, that the trial court rejected that submission, and that the defendants objected to that omission.[6] Under the codal authorities cited above, the appellate court clearly had the authority to consider the issue of the adequacy of the jury instructions even though there was no assignment of error in that regard.[7]See Georgia Gulf Corp. v. Board of Ethics for Public Employees, 96-1907 (La.5/9/97), 694 So.2d 173, 175-76.
Louisiana jurisprudence is well established that an appellate court must exercise great restraint before it reverses a jury verdict because of erroneous jury instructions. Melancon v. Sunshine Const., Inc., 97-1167 (La.App. 1 Cir. 5/15/98), 712 So.2d 1011. The basis for this rule of law is that trial courts are given broad discretion in formulating jury instructions and it is well accepted that a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. United States v. L'Hoste, 609 F.2d 796, 805 (5 Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). However, when a jury is erroneously instructed and the error probably contributed to the verdict, an appellate court must set aside the verdict. Smith v. Travelers Ins. Co., 430 So.2d 55 (La.1983). In the assessment of an alleged erroneous jury instruction, it is the duty of the reviewing court to assess such impropriety in light of the entire jury charge to determine if they adequately provide the correct principles of law as applied to the issued framed in the pleadings and evidence and whether they adequately guided the jury in its deliberation. Kaplan v. Missouri-Pacific R.R. Co., 409 So.2d 298, 304-05 (La.App. 3 Cir.1981). Ultimately, the determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice. Brown v. White, 405 So.2d 555, 560 (La.App. 4 Cir.1981), aff'd, 430 So.2d 16 (La.1982).
In White, we carefully defined the parameters for intentional infliction of emotional distress, specifying that: (1) the conduct of the defendant must be extreme and outrageous; (2) that the emotional distress suffered must be severe; and (3) that the defendant desires to inflict emotional distress or knew that such distress was certain or substantially certain to result from the conduct. White, 585 So.2d at 1209.
In the case sub judice, after reciting the codal articles for negligence and vicarious liability, the trial court instructed the jury as follows:

*1024 Employers are responsible for the acts of their employees while the employee is in the course and scope of their employment. Fraud is a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. If you find that the preponderance of evidence shows that Allstate or William Monie or Larry Rhodes either misrepresented the truth to Mr. Nicholas or failed to tell him the truth with the intention either to obtain an unjust advantage for themselves or to cause a loss or inconvenience for him, then you may award to the plaintiffs the damages they suffered as a result of that conduct.
An intentional act toward an employee is an act whereby the defendant either desired to bring about the physical results of his act or believed that they were substantially certain to follow from what he did.
Viewing this instruction in light of our pronouncements in White, it is evident that the trial court failed to properly instruct the jurors with the correct standard with which to evaluate defendants' conduct. Glaringly omitted is any reference to the requirement that the defendants' conduct be extreme and outrageous and that plaintiff's emotional distress be severe. Our review of jurisprudence in this state[8] and throughout the nation[9] underscores and highlights the inadequacy of the jury instructions at issue. Without the proper instructions defining the parameters of intentional infliction of emotional distress, the jurors were led astray in their deliberations and this error more likely than not contributed to their verdict. The jurors could not have considered whether the defendants' conduct was so extreme and outrageous, nor the severity of Nicholas' emotional distress because they were not told to make these findings. These findings are essential to support a claim for intentional infliction of emotional distress. Accordingly, we find that the appellate court erred as a matter of law by failing to find that the jury instructions misled the jury in its assessment of the tort of intentional infliction of emotional distress and failed to interdict the jury verdict.
Because of the erroneous jury instructions, we are compelled to interdict the jury verdict and make an independent determination of the facts from the record without according any weight whatsoever to the factual findings of the erroneously instructed jury. Picou v. Ferrara, 483 So.2d 915, 918 (La.1986).[10]

Overview: tort of intentional infliction of emotional distress
A canvass of national jurisprudence shows that courts require truly outrageous *1025 conduct before allowing a claim for intentional infliction of emotional distress even to be presented to a jury.[11] Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous.[12]See, e.g., Marques v. Fitzgerald, 99 F.3d 1 (1st Cir.1996) (applying Rhode Island law) (holding that an employer's termination of employee just days shy of probationary period was not outrageous conduct); Atkinson v. Denton Pub. Co., 84 F.3d 144 (5th Cir.1996) (applying Texas law) (holding that a claim for intentional infliction of emotional distress was not shown when the employer abruptly terminated a long-standing employee without notice and even though employer published false and defamatory reasons to co-employees within the company about the termination); Haun v. Ideal Indus., 81 F.3d 541 (5th Cir.1996) (applying Mississippi law) (holding that the conduct of the fired employee's former supervisor did not rise to an extreme degree even though the former supervisor lied to the employee about probationary status, was three months dilatory in informing employee of probationary status, and failed to abide by his promise to remove the employee from probationary status); Stults v. Conoco, Inc., 76 F.3d 651 (5th Cir.1996) (applying Texas law) (holding that insufficient evidence was shown to support a claim for intentional infliction of emotional distress when it was established that the supervisor had a smile or smirk on his face when he discussed the former employee's work record and then failed to contact the employee even though he promised such action); Santiago-Ramirez v. Secretary of Dept. of Defense, 62 F.3d 445 (1st Cir.1995) (applying Puerto Rico law) (holding that evidence that employer was accusatory of employee for leaving the work premises with merchandise from the store and detention of the employee for 45 minutes during which time the employee was questioned and told that her conduct would be reported to the FBI if cooperation was not forthcoming was insufficient to rise to the level of being intentional infliction of emotional distress); Burden v. General Dynamics Corp., 60 F.3d 213 (5th Cir.1995) *1026 (applying Texas law) (holding that an employer's reassignment of an employee to a new job which substantially involved tasks similar to the employee's principal job was insufficient to constitute an action for intentional infliction of emotional distress); Hanson v. Hancock County Mem'l Hosp., 938 F.Supp. 1419 (N.D.Iowa 1996) (applying Iowa law) (holding that a supervisor who used her position as a hospital employee to acquire information about the employee's hospitalization in the hospital that later formed the basis for termination of the employee was held insufficiently outrageous); Fernandez v. Community Asphalt, Inc., 934 F.Supp. 418 (S.D.Fla. 1996) (applying Florida law) (holding that the employer's verbal abuse of an employee coupled with threats of economic sanctions if the employee failed to sign a general release, though constituting an illegal termination of the employee, failed to constitute intentional infliction of emotional distress); Ali v. Douglas Cable Communications, 929 F.Supp. 1362 (D.Kan.1996) (applying Kansas law) (held that a claim for intentional infliction of emotional distress was not supported by inappropriate disciplining of employee accused of theft, even though employer monitored employee's telephone calls and demanded removal of employee from the work premises); Dandridge v. Chromcraft Corp., 914 F.Supp. 1396 (N.D.Miss.1996) (applying Mississippi law) (holding that an employer's racially motivated demotion of an employee was not sufficiently extreme and outrageous to establish a claim for intentional infliction of emotional distress); Harvey v. Strayer College, Inc., 911 F.Supp. 24 (D.D.C.1996) (applying District of Columbia law) (holding that an employee's termination did not constitute extreme and outrageous conduct even though the pregnant employee was summoned and confronted with questioning about her ability to conduct fall registration, knowing that earlier pregnancies had resulted in untoward hospitalization, and the manager laughed and advised employee that the president was unavailable to respond to her queries relative to her termination of employment).
On the other hand, the following jurisprudential sampling of cases beyond our borders are referenced to show what conduct was found extreme and outrageous to support a claim for intentional infliction of emotional distress.[13]See, e.g. Harris v. Procter & Gamble Cellulose Co., 73 F.3d 321 (11th Cir.1996) (applying Georgia law) (holding that an employee stated a sufficient claim for intentional infliction of emotional distress when he alleged a pattern of harassment, threatened termination, humiliation, and supervisory indifference after employee brought allegedly dangerous work conditions to light); Bristow v. Drake Street, Inc., 41 F.3d 345 (7th Cir. 1994) (applying Illinois law) (holding that a claim for intentional infliction of emotional distress was supported when the employer subjected the employee to a protracted series of "outrages that included firing [and promptly rehiring the employee] between 12 and 40 times ..., yelling at her, following her around at work, stalking her in non-working hours, banging on the door of her apartment late at night, calling her ten to thirty times a night, and leaving messages on her telephone answering machine that he hated her and wished her dead."); Bernard v. Doskocil Companies, 861 F.Supp. 1006 (D.Kan.1994) (applying Kansas law) (holding that a cumulative barrage of racial slurs and physical threats, including a threat to set the employee afire, may constitute extreme and outrageous conduct).
Although recognizing a cause of action for intentional infliction of emotional distress in a workplace setting, this state's jurisprudence has limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time. White, 585 So.2d at 1205; Maggio v. St. Francis Med. Ctr., Inc., 391 *1027 So.2d 948 (La.App. 2 Cir.1980), writ denied, 396 So.2d 1351 (La.1981). The distress suffered by the employee must be more than a reasonable person could be expected to endure. Moreover, the employer's conduct must be intended or calculated to cause severe emotional distress, not just some lesser degree of fright, humiliation, embarrassment or worry. White, 585 So.2d at 1210.
A sampling of Louisiana cases post-White indicate a mosaic from the work place which exemplifies the importance of White's threefold criteria and establishes our conformity with the national jurisprudence. See, e.g., the following cases which failed to establish facts sufficient to constitute the intentional infliction of emotional distress: Smith v. Ouachita Parish Sch. Bd., 29,873 (La.App. 2 Cir.9/24/97), 702 So.2d 727, writ denied, 97-2721 (La.1/16/98), 706 So.2d 978 (holding that the wrongful demotion and transfer of a teacher within the school system, though causing emotional and psychological distress, did not constitute extreme and outrageous conduct); Stewart v. Parish of Jefferson, 95-407 (La.App. 5 Cir.1/30/96), 668 So.2d 1292, writ denied, 96-0526 (La.4/8/96), 671 So.2d 340 (holding that intentional infliction of emotional distress was not shown, even though a supervisor maintained two-year's harassment in which he questioned the worker's personal life, increased the workload, and pressured the employee to accept a demotion which ultimately led to the employee's termination); Beaudoin v. Hartford Acc. & Indem. Co., 594 So.2d 1049 (La.App. 3 Cir.), writ denied, 598 So.2d 356 (La.1992) (holding that even if the employee felt singled out for abuse, a supervisor's eight-month undertaking in which he shouted at an employee, cursed her, called her names (dumb, stupid, and fat), commented about the inferiority of women, and falsely accused her of making mistakes did not constitute extreme and outrageous conduct); Deus v. Allstate Ins. Co., 15 F.3d 506 (5th Cir.), cert. denied, 513 U.S. 1014, 115 S.Ct. 573, 130 L.Ed.2d 490 (1994) (holding that employer may call upon an employee to do more than others, use special review on particular employees and not others to downgrade performance, institute long term plan to move younger persons into sales and management positions without engaging in extreme and outrageous conduct); Trahan v. Bellsouth Tel., Inc., 881 F.Supp. 1080 (W.D.La.), aff'd, 71 F.3d 876 (5th Cir.1995) (holding that employers use of a security team to ridicule, tease, and taunt plaintiff for seven and one-half hours questioning was not conduct which was outrageous); Glenn v. Boy Scouts of America, 977 F.Supp. 786 (W.D.La.1997) (holding that telling an employee that she was rumored to have had a sexual affair with a prior scout executive, being told that her placement next to a donor who liked her was because she might get more money from him, communication to her that he did not want a woman in her position, being called a total disgrace in a staffing meeting after she successfully completed her probationary period, and being told that she would be terminated on an undisclosed volunteer complaint unless she voluntarily resigned, did not constitute extreme and outrageous conduct).
Compare Bustamento v. Tucker, 607 So.2d 532 (La.1992) (holding that almost daily improper sexual comments and advances, threatened physical violence, and an attempt to run over the plaintiff with a forklift constituted extreme and outrageous conduct); Walters v. Rubicon, Inc., 96-2294 (La.App. 1 Cir.12/29/97), 706 So.2d 503 (holding that extreme and outrageous conduct was shown when plaintiff's supervisors continuously abused plaintiff verbally, ordered him to ignore company policy which he saw as illegal, harassed him with phone calls, endangered him and his son when a supervisor cut in front of him in traffic, and another supervisor pointed his hand at him in the form of a gun and mouthed "pow"); Wright v. Otis Engineering Corp., 94-257 (La.App. 3 Cir. 10/5/94), 643 So.2d 484, 487 (holding that allegations that the supervisor daily addressed *1028 profanity-filled tirades to an employee for five years, often threatening the worker's continued employment, knowing that the employee had been hospitalized for depression and received electric shock treatment, prohibited the entry of summary judgment on the issue of whether the supervisor was substantially certain that his actions would cause harm to the worker).

Merits of present case
In the case sub judice, the testimony focused on several incidents to support the allegations regarding the intentional infliction of emotional distress by Allstate and Monie on Nicholas. Initially, Nicholas contends that his to corrective review was manipulated and vindictively motivated. He contends that he was neither the lowest producing agent nor deserving of placement on corrective review.
The record shows that Nicholas's review process commenced when Monie directed the sales managers in his territory to forward the name of the worst producing agent in their peer groups. According to Monie, he wanted to "stir things up from the bottom." At that time Monie specifically told Ebbs that Nicholas was the name that he would forward. As Ebbs stated, Monie wanted Nicholas's "scalp on [his] tepee pole."[14] Monie's zeal in this regard was highlighted when Ebbs submitted another agent's name who was actually the lowest producer. At that time, Monie instructed Ebbs to expand his review so that Nicholas would become the lowest peer group performer. After Ebbs increased the review categories to twenty-seven,[15] Nicholas was shown to be the least producing agent overall.
As evidence that such action exemplified Monie's management techniques, Nicholas offered the testimony of Ed DeLorenzo, an Allstate agent from the Arizona region, who spoke of having been targeted by Monie when Monie was his territorial sales manager.[16] Although DeLorenzo was a top producing agent, Monie purportedly sought to make an example of him so that other agents would be shaken and be more likely to follow Monie's supervision. Accordingly, Nicholas presented DeLorenzo's testimony to shed insight on Monie's actions in this case.
When questioned about Monie's motivation in targeting Nicholas, Ebbs recalled that at an earlier agents' meeting, an agent or agents criticized Monie and Blankenship in an evaluation of their day-long presentation for having acted unprofessionally when they "dipped" tobacco and cursed during the meeting. Ebbs suspected that Monie attributed this poor evaluation to Nicholas because he was one of the more religious agents at Allstate's office on Florida Street.
There is no doubt that Monie singled out Nicholas from his peers for corrective review. Although Monie's tactic seem arbitrary and without compassion, we cannot say that his conduct rises to the high threshold of extreme and outrageous conduct. We say this for two reasons. First, the evidence overwhelmingly shows that Nicholas was only an average Allstate agent. His yearly evaluations *1029 bear out this fact and show that many of Nicholas's own written comments to his supervisors' reviews recognized this reality. In addition, it is likewise clear that Ebbs's expanded review categories comprised legitimate production lines available in the Allstate system and included performance elements related to improved production. See Deus, 15 F.3d at 506 (holding that employer may call upon an employee to do more than others, use special review on particular employees and not others to downgrade performance). Also, in this regard, the record is void of any evidence that the production figures used throughout Nicholas's corrective review were inaccurate or misrepresented in any way.[17] The fact that Monie may have used the term "scum" to refer to the lower producing agents, though demeaning and inappropriate, this language was never shown to have been directed to Nicholas individually and was not shown to have been heard by him when Monie uttered the term.[18] Second, as a territorial sales manager, it cannot be denied that Monie had an interest in the improvement of sales figures among the poorer producing agents. Although Monie's technique may be subject to criticism because it was demeaning, inappropriate, and not fully justified, we cannot say that it was outrageous conduct or conduct which went beyond the bounds of decency.
It, too, cannot be gainsaid that Nicholas's corrective review, lasting over a year, was longer than was customary. Notwithstanding, the record further shows that this delay can be attributed to administrative errors on Allstate's part that Allstate itself detected through internal controls that worked to protect Nicholas. For instance, the corrective review that Ebbs attempted to give Nicholas on May 10, 1984, had to be withdrawn because it was discovered that the regional office had not approved the action and Ebbs had miscalculated Nicholas's goals. That Nicholas was not given credit for his insurance production during the withdrawn review period, though seemingly unfair, can be related to Allstate's goal of encouraging production. See, e.g., Deus, 15 F.3d at 506 (holding that employer may call upon an employee to do more than others, use special review on particular employees and not others to downgrade performance). Another example was the extension of Nicholas's corrective review that occurred in the Spring of 1985 because Ebbs failed to meet regularly with Nicholas as had been promised in the preceding review. Although these occurrences lengthened Nicholas's corrective review, the proper functioning of Allstate's internal controls clearly necessitated this delayall for the protection and benefit of Nicholas. Likewise, it can also be said that Nicholas's mishandling of a cancellation of Beulah McCormick's policy in the Fall of 1984 further complicated the review process and ultimately resulted in his placement on permanent personal review for having mishandled funds in that matter.[19] Thus, it cannot be said that Allstate purposefully abused the corrective review process to cause Nicholas emotional distress.[20]
*1030 Finally, Nicholas urges that Monie's continued involvement in the review process after Rhodes replaced him as territorial sales manager was unseemingly intrusive and abusive. Exemplifying Monie's intentional action toward him, Nicholas cites Rhodes's abrupt reversal of position toward Ebbs's recommendation that Nicholas be removed from the review process. Nicholas claims that Monie colored Rhodes's attitude against him. In explanation of the chronology of events, Monie and Rhodes point out that Monie's continued involvement can be justified by the fact that Rhodes was new to the position whereas Monie had been involved in Nicholas's review process from the beginning. Although we recognize the sharp reversal of Rhodes's opinion regarding the continuation of Nicholas's corrective review, we must acknowledge that reliance on Monie's knowledge is fully explainable as an example of shared information that normally occurs when there is a change in supervisory personnel in the corporate setting. It would be foolhardy on our part not to recognize such activity in this age where mobility within a national corporation, such as Allstate, regularly occurs. Again, although we might question Monie's motives, we recognize that disciplinary action and conflict in a pressure-packed workplace environment, though calculated to cause some degree of mental anguish, are not ordinarily actionable. White, 585 So.2d at 1210.
Moreover, the evidence fails to show that Allstate and Monie knew that severe emotional distress would be substantially certain to follow because of their conduct. Even though the record establishes that Nicholas began treatment for symptoms of anxiety in the early 1980s, long before both the initiation of corrective review and his termination, it is equally clear that neither Allstate nor Nicholas's supervisors were ever aware of that fact. Likewise, although Nicholas genuinely felt humiliated, anxious, confused, upset and worried because of the corrective review process, we cannot say that Nicholas's emotional distress was more than a reasonable employee might be expected to endure in the workplace. Compare: Bustamento, 607 So.2d at 532; Walters, 706 So.2d at 503; Wright, 643 So.2d at 484; Harris, 73 F.3d at 321; Bristow, 41 F.3d at 345; Bernard, 861 F.Supp. at 1006.

FRAUD & DETRIMENTAL RELIANCE CLAIMS
Nicholas further argued to the jury that Allstate acted fraudulently in his dismissal. Nicholas focuses on the number of categories used in his evaluation and Allstate's reliance on a "reconstructed" personnel file with regard to his work history.
It is well accepted that fraud is the misrepresentation or suppression of the truth intentionally made to obtain an unjust advantage over another, or to cause either a loss or inconvenience to another party. LA. CIV.CODE art. 1953.
George Bishop testified at length about the 27 categories that Ebbs used to determine that Nicholas was the lowest producing agent. Bishop identified that the categories used to measure Nicholas were actual lines of production available through Allstate and appeared in the Agent Growth, Profit Profile. He further testified that the personnel within the human resources department verified the computer generated figures and concluded that based upon these figures Nicholas was the lowest producer in his peer group. Thus, there was no evidence presented to show that the figures produced were fraudulently calculated.
It was established at trial that Allstate "reconstructed" Nicholas's personnel file for trial purposes. In this regard, Nicholas primarily relies upon the fact that Ebbs's memos which recommended his removal from corrective review were absent. We find this of no moment. Even assuming that Ebbs's letters did urge Nicholas's *1031 removal from corrective review, at best these were recommendations and were subject to rejection by Ebbs's supervisors.
Nicholas further contended in the trial court he relied upon Allstate to perform several promises to his detriment. He relies upon Ebbs's promised assistance during the corrective review process and the duty Allstate owed him not to "lose" policy applications he may have submitted.
LA. CIV.CODE art. 1967 provides, in pertinent part:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying.
In Morris v. Friedman, 94-2808 (La.11/27/95), 663 So.2d 19, 25, and cases cited therein, we recognized three elements required for the application of detrimental reliance: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance.
It was well established at trial that Allstate assured Nicholas that Ebbs would assist him during the process of corrective review. As we noted above, Allstate's supervisory personnel recognized that Ebbs failed to live up to this commitment. Accordingly, Allstate unilaterally extended Nicholas's corrective review because of that fact in hope of fulfilling its promise. In light of Allstate's corrective action, we find no merit to Nicholas's contention in regard to this assertion.[21]
Nicholas further urges that it was implicit in his employment relationship that Allstate would faithfully guard against the loss of any policy application that he might forward to them for acceptance. Thus, he asserts that Allstate's loss of two applications during his corrective review constituted a breach of its implied promise to him. Although it was established that Nicholas did not receive credit for these two applications, the evidence does not perponderate that Allstate deliberately lost these policies. Even if these policies had been found, the record contains no evidence that the applications would have passed Allstate's underwriting criteria. Thus, we find that Nicholas failed to present a prima facie case of detrimental reliance.[22]

DECREE
For the foregoing reasons, the judgments of the lower courts are reversed and set aside. Judgment is hereby rendered in favor of Allstate Insurance Company and William Monie, Jr. and against Rodney Nicholas and Neva Nicholas, dismissing their claims with prejudice. Costs of these proceedings are assessed to the plaintiffs.
REVERSED.
CALOGERO, C.J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissenting in part.
I agree with the majority's conclusion that the jury instruction for plaintiff's intentional infliction of emotional distress claim was so inadequate as to mandate a reversal of the jury's verdict in favor of the plaintiff. I write separately, however, to dissent from the majority's resolution of the merits of this case.
In Buckbee v. United Gas Pipe Line Co., this Court found errors in the trial court's evidentiary rulings that may have affected *1032 the jury's conclusions. See Buckbee, 561 So.2d 76, 86 (La.1990). As a result, the court remanded the case to the court of appeal for an independent review of the record and a judgment on the merits. See id. at 86. The Court reasoned that remand was proper for two reasons:
First, the appellate court has the primary responsibility for reviewing the trial court's factual determinations. Second, the proper allocation of functions between the lower appellate courts and the Supreme Court is best served by consigning the first appellate review to the court of appeal and preserving to this Court discretionary review upon the litigant's petition for certiorari.
Id. at 87 (citing Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973)); accord Gonzales v. Xerox Corp., 320 So.2d 163, 166 (La.1975). Consequently, the court concluded that the court of appeal "must disregard the jury's conclusions and review the record with a fresh eye." Buckbee, 561 So.2d at 87.
The majority opinion, in a footnote, acknowledges this line of jurisprudence but then concludes that "[i]n the present case, we find it appropriate for us to reach the merits of the case because the appellate court fleshed out salient factual differences in its majority and dissenting opinions." Ante at 1024 n. 10. This position ignores the fundamental structure of our judicial system.
The Louisiana Supreme Court is the court of last resort in the state. As such, "[t]he supreme court has general supervisory jurisdiction over all other courts." La. Const. Art. V, Sec. 5(A). While this court certainly has jurisdiction over both law and fact in civil cases, see La. Const. Art. V, Sec. 5(C), the preferable structure of our court system is one in which this court reviews the factual and legal conclusions reached by other courts within the state.
In this case, we have determined that the jury's verdict cannot be accepted as it was tainted by an improper jury instruction. The court of appeal in this case reviewed the jury's conclusions under a manifest error standard and simply searched the record for support of the jury's conclusions. See Nicholas v. Allstate Ins. Co., 30,735, pp. 11, 16 (La.App. 2 Cir.5/28/99), 739 So.2d 830, 839, 842. Consequently, a valid independent review and determination on the merits has yet to be made by any court and it is not preferable for this court to undertake such a review at this juncture. In my view, the constitution and our jurisprudence both illustrate that the proper course of action would be to remand this case to the Second Circuit Court of Appeal for an independent determination of the merits of the plaintiff's claims without deference to the jury's initial verdict.
NOTES
[*] Victory, J., recused, not on panel. Rule IV, Part 2, § 3.
[1] The amended agreement did not define what was considered "unsatisfactory work" or what time was encompassed by the term "reasonable opportunity."
[2] In reversing the jury awards for loss of income and lost retirement benefits, the appellate court reasoned that the contract provisos that called for notice and an improvement period did not establish a fixed term of employment and did not restrict Allstate's authority to determine in its sole discretion when an agent's performance was unsatisfactory and to decide that an employee had not achieved satisfactory improvement. Nicholas, 739 So.2d at 838.
[3] Because of our determination of the merits adverse to Nicholas, we do not reach the prescription issue addressed in the appellate court.
[4] Although the Restatement is not binding on Louisiana courts, the restrictions and guidelines established therein for policy reasons do provide guidance to our courts in the adjudication of these claims. Steadman v. South Cent. Bell Tel. Co., 362 So.2d 1144 (La.App. 2 Cir.1978); White, 585 So.2d at 1209-10.
[5] In one sense, it appears that the appellate court informally addressed the question in a pro forma manner in the footnote and, without much examination, resolved the issue in favor of manifest error review. Notwithstanding, we find that the appellate court erred as a matter of law in its resolution of the jury instruction question.
[6] For completeness, we further observe that the plaintiffs likewise submitted jury instructions in line with White.
[7] In making this statement, we in no way abrogate that body of jurisprudence which requires that a party must assert an objection in the trial court in order for an appellate court to reach the issue, whether by assignment of error or otherwise. See, e.g., Roadrunner Motor Rebuilders, Inc. v. Ryan, 603 So.2d 214, 219-20 (La.App. 1 Cir.1992); Haltom v. State Farm Mut. Auto. Ins. Co., 588 So.2d 792, 794 (La.App. 2 Cir.1991). As observed in this matter, the defendants objected to the jury instructions and incorporated their proposed White instructions in their objection. We further note that our analysis of this issue does not signal our intention to abolish the requirement that constitutional issues be specifically pleaded and argued in the trial court. Vallo v. Gayle Oil Co., 94-1238 (La.11/30/94), 646 So.2d 859, 864 (noting that the requirements of Lemire v. New Orleans Public Serv., Inc., 458 So.2d 1308 (La.1984) "that the constitutionality of a statute must first be questioned in the trial court and that the plea of unconstitutionality must be specifically pled to be considered by the trial court").
[8] See infra pp. 1026-28.
[9] See infra pp. 1025-26.
[10] Even though we, like the appellate court, have appellate jurisdiction of both law and fact in civil matters, and may perform an independent review and render judgment on the merits, see Buckbee v. United Gas Pipe Line Co., 561 So.2d 76 (La. 1990) (citing LA. CONST. art. V, § 5(C) and Thomas v. Missouri Pacific R.R. Co., 466 So.2d 1280 (La.1985)), we have not always chosen to conduct a de novo review of the record. Our reasons for opting not to conduct a de novo review is usually prompted by two considerations. First, the appellate courts of this state are charged with the primary responsibility of reviewing the trial court's factual findings. Second, we have consistently recognized that the "proper allocation of functions between the lower appellate courts and the Supreme Court is best served by consigning the first appellate review to the court of appeal and preserving to this Court discretionary review upon the litigant's petition for certiorari." Buckbee, 561 So.2d at 87 (citing Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973) for the proposition that the preservation of the proper allocation of functions between the trial and appellate courts is one reason the appellate courts adhere to the manifest error standard of review). In the present case, we find it appropriate for us to reach the merits of the case because the appellate court fleshed out the salient factual differences in its majority and dissenting opinions.
[11] Some courts have held that the conduct of an employer toward its employee does not ordinarily give rise to a claim for intentional infliction of emotional distress. See, e.g. Tischmann v. ITT/Sheraton Corp., 882 F.Supp. 1358 (S.D.N.Y.1995) (applying New York law) (holding that a former employee cannot utilize claims for intentional or negligent infliction of emotional distress to circumvent the employment-at-will doctrine; to hold otherwise would undermine an employer's ability to demote (or dismiss) its employees); Glasgow v. Sherwin-Williams Co., 901 F.Supp. 1185 (N.D.Miss.) (applying Mississippi law) (holding that mere employment disputes do not give rise to claims for intentional infliction of emotional distress claims and further noting that such a cause of action arising in the workplace is limited to those cases which display a pattern of deliberate, repeated harassment over a period of time); Pardasani v. Rack Room Shoes, Inc., 912 F.Supp. 187 (M.D.N.C.1996) (applying North Carolina law) (holding that the allegations of a former employee received poor performance evaluations, was not given promotions that others received, was excluded from training, and was finally terminated in retaliation for asserting an age discrimination claim did not state a claim for intentional infliction of emotional distress); Pegues v. Emerson Elec. Co., 913 F.Supp. 976 (N.D.Miss.1996) (applying Mississippi law) (holding that an employer's actions in the termination of an employee were within the domain of an ordinary employment dispute); Hockaday v. Texas Dept. of Criminal Justice, Pardons & Paroles Div., 914 F.Supp. 1439 (S.D.Tex.1996) (applying Texas law) (holding that employment disputes and even the termination of an employee in contravention of the Texas Whistle blowers Act did not constitute extreme and outrageous conduct); Herman v. United Brotherhood of Carpenters, 60 F.3d 1375 (9th Cir.1995) (holding that Nevada law precludes an employee's claim for emotional distress in the context of employment).
[12] Conduct within the context of sexual harassment is not included in this category. Reference to sexual harassment as a categorization of employer/supervisor misconduct is perhaps the most often recognized claim under a theory of intentional infliction of emotional distress. See, e.g., Prunty v. Arkansas Freightways, Inc., 16 F.3d 649 (5th Cir.1994); Barb v. Miles, Inc., 861 F.Supp. 356 (W.D.Pa. 1994).
[13] See also, 12, supra.
[14] Compare this indirect statement to that which was directed to and personally heard by the employees in White. See p. 1022, supra.
[15] The evidence does not show any approved or recommended number of goals for corrective review. To the contrary, it seems that the number of goals fluctuated with each salesman. Although Nicholas was ultimately given 27 goals, Charles Scott had five 60-day goals, Bill Walsworth had four 60-day goals, and David Shelby had eight 60-day goals.
[16] According to DeLorenzo, Monie targeted him because he (DeLorenzo) earned more money than Monie. DeLorenzo thought that Monie's strategy was to bring him down to frighten less productive agents into working harder. He also felt that his demise would be further effective because he was well respected among the agents' corp; he perceived Monie's stratagem as one which would utilize his downward progression with one goal in mind: the lowering of the fellow agents' respect for DeLorenzo would cause them to flock to Monie's camp.
[17] The one exception might be the two homeowners' applications which were not credited to Nicholas's production because management purportedly lost them while they were being processed. The record, however, fails to preponderate that this isolated instance was purposefully done.
[18] See footnote 14, supra.
[19] Nicholas failed to respond to a notice of cancellation of his customer's policy. As a result his mistake caused Allstate to pay the claim of another insurance company. Because of this, Allstate involved its internal security office in the investigation of Nicholas's financial records. Although it appears that Monie may have forged Ebbs's name on a letter recommending that Nicholas be placed on permanent personal review because of this incident, we find this of little moment because Nicholas did not deny that he erred in this regard.
[20] In making this statement, we neither sanction nor give approval to Allstate's manner in handling Nicholas' corrective review. Rather, we simply find that Allstate's conduct did not rise to the high threshold of extreme and outrageous conduct.
[21] We further note that Nicholas noted on a number of his annual performance reviews that he received ongoing supervisory assistance in improving his sales performance; he also stated several times that he did not need any further training from Allstate.
[22] Having found that Nicholas is not entitled to recovery, we further find that Neva Nicholas's claim for loss of consortium also falls because her claim is derivative of her husband's. See Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La.7/1/97), 696 So.2d 569.