811 So.2d 1165 (2002)
Arnold Martin GOLDBERG
v.
Alfred H. MOSES, Individually and in His Capacity as Owner of Glazer Steel Corporation, Jay A. Glazer, Individually and in His Capacity as President of Glazer Steel Corporation, and Glazer Steel Corporation.
No. 2000-CA-2538.
Court of Appeal of Louisiana, Fourth Circuit.
March 6, 2002.
Rehearing Denied April 16, 2002.
*1166 W. Patrick Klotz, Klotz & Early, and Robert G. Harvey, Sr., New Orleans, LA, for Plaintiff/Appellee.
Randall A. Smith, Andrew L. Kramer, L. Tiffany Hawkins Davis, Smith, Jones & Fawer, L.L.P., New Orleans, LA, for Defendant/Appellant Glazer Steel Corporation, Etc.
Phillip A. Wittmann, April D. Dulaney, Barry W. Ashe, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, for Defendant/Appellant Alfred H. Moses.
Court composed of Chief Judge WILLIAM H. BYRNES III, Judge JOAN BERNARD ARMSTRONG and Judge TERRI F. LOVE.
JOAN BERNARD ARMSTRONG, Judge.
This is an appeal from a judgment for the plaintiff for intentional infliction of mental distress in connection with a termination of employment. Plaintiff Arnold M. Goldberg sued his former employer, Glazer Steel Corporation, the President of Glazer Steel, Jay Glazer, and the executor for the estate that owned Glazer Steel, Alfred H. Moses. The trial court rendered judgment against Glazer Steel and Mr. Moses but dismissed the claims against Jay Glazer. Because we find that, as a matter of law, the facts found by the trial court to be tortious are not sufficient to impose liability, we must reverse. Crucial to our decision is the Supreme Court's recent decision in Nicholas v. Allstate Ins. Co., 99-2522 (La.8/31/00), 765 So.2d 1017. Notably, the Supreme Court's Nicholas decision is the first decision by the Supreme Court addressing the tort of intentional infliction of emotional distress in the inherently-distressful context of involuntary employment termination.
Even before turning to the specific context of involuntary termination of employment, the Nicholas Court emphasized the extremely demanding standard a plaintiff must meet in order to show actionable intentional infliction of mental distress. Quoting from the Restatement, the Nicholas Court said:
It has not been enough that the defendant has acted with an intent which is tortuous or even criminal, or that he has intended to inflict emotional distress, or even that this conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous!"
705 S.2d at 1022 (quoting Restatement Second of Torts § 46 comment D). The Nicholas Court then held that:

*1167 In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.
765 So.2d at 1022 (quoting White v. Monsanto, 585 So.2d 1205, 1209 (La.1991)).
The Nicholas Court turning to the context of involuntary termination of employment, then noted that the national jurisprudence makes actionable only "truly outrageous" "extreme" conduct.
A canvass of national jurisprudence shows that courts require truly outrageous conduct before allowing a claim for intentional infliction of emotional distress even to be presented to a jury. Conduct which is merely tortuous or illegal does not rise to the level of being extreme and outrageous. See, e.g., Marques v. Fitzgerald, [99 F.3d 1 (1st Cir.1996)] (applying Rhodes Island law) (holding that an employer's termination of employee just days shy of probationary period was not outrageous conduct); Atkinson v. Denton Pub. Co., [84 F.3d 144 (5th Cir.1996)] (applying Texas law) (holding that a claim for intentional infliction of emotional distress was not shown when the employer abruptly terminated a long-standing employee without notice and even though employer published false and defamatory reasons to co-employees within the company about the termination); Haun v. Ideal Indus., [81 F.3d 541 (5th Cir.1996)] (applying Mississippi law) (holding that the conduct of the fired employee's former supervisor did not rise to an extreme degree even though the former supervisor lied to the employee about probationary status, was three months dilatory informing employee of probationary status, and failed to abide by his promise to remove the employee from probationary status).
765 So.2d at 1024-26. Lastly, the Nicholas Court noted that Louisiana jurisprudence limits the cause of action for intentional infliction of emotional distress in the workplace setting and conforms to the national jurisprudence.
Although recognizing a cause of action for intentional infliction of emotional distress in a workplace setting, this state's jurisprudence has limited the cause of action to cases which involve a pattern of deliberate, repeated harassment over a period of time. White; Maggio v. St. Francis Med. Ctr., Inc., [391 So.2d 948 (La.App. 2 Cir.1980)] writ denied. The distress suffered by the employee must be more than a reasonable person could be expected to endure. Moreover, the employer's conduct must be intended or calculated to cause severe emotional distress, not just some lesser degree of fright, humiliation, embarrassment or worry. White.

A sampling of Louisiana cases post-White indicate a mosaic from the work place which exemplifies the importance of White's threefold criteria and establishes our conformity with the national jurisprudence. See, e.g., the following cases which failed to establish facts sufficient to constitute the intentional infliction of emotional distress: Smith v. Ouachita Parish Sch. Bd., [29,873, (La. App. 2 Cir. 9/24/97), 702 So.2d 727] writ denied, (holding that the wrongful demotion and transfer of a teacher within *1168 the school system, though causing emotional and psychological distress, did not constitute extreme and outrageous conduct); Stewart v. Parish of Jefferson, writ denied, 96-0526 (La.4/8/96), 671 So.2d 340, (holding that intentional infliction of emotional distress was not shown, even though a supervisor maintained two-year's harassment in which he questioned the worker's personal life, increased the workload, and pressured the employee to accept a demotion which ultimately led to the employee's termination); Beaudoin v. Hartford Acc. & Indem. Co., [594 So.2d 1049] (La.App. 3 Cir.[1992]), writ denied, (holding that even if the employee felt singled out for abuse, a supervisor's eight-month undertaking in which he shouted at an employee, cursed her, called her names (dumb, stupid, and fat), commented about the inferiority of women, and falsely accused her of making mistakes did not constitute extreme and outrageous conduct); Deus v. Allstate Ins. Co., [15 F.3d 506] (5th Cir.[1994]), cert. denied, (holding that employer may call upon an employee to do more than others, use special review on particular employees and not others to downgrade performance, institute long term plan to move younger persons into sales and management positions without engaging in extreme and outrageous conduct); Trahan v. BellSouth Tel., Inc., [881 F.Supp. 1080] (W.D.La.[1995]), aff'd, (holding that employers use of a security team to ridicule, tease, and taunt plaintiff for seven and one-half hours questioning was not conduct which was outrageous); Glenn v. Boy Scouts of America, [977 F.Supp. 786 (W.D.La.1997)] (holding that telling an employee that she was rumored to have had a sexual affair with a prior scout executive, being told that her placement next to a donor who liked her was because she might get more money from him, communication to her that he did not want a woman in her position, being called a total disgrace in a staffing meeting after she successfully completed her probationary period, and being told that she would be terminated on an undisclosed volunteer complaint unless she voluntarily resigned, did not constitute extreme and outrageous conduct).
765 So.2d at 1026-27.
In evaluating the facts in the Nicholas case, the Supreme Court condemned the conduct of the defendant, but found that it was not actionable. For example, the Court found that the defendant's "tactics seem arbitrary and without compassion" but that they did not rise "to the high threshold of extreme and outrageous conduct". 765 So.2d at 1028. The Court also found that while the defendant's "technique may be subject to criticism because it was demeaning, inappropriate, and not fully justified, we cannot say that it was outrageous conduct or conduct which went beyond the bounds of decency". 765 So.2d at 1029. The Court noted that "we neither sanction nor give approval to" the defendant's conduct but that the defendant's conduct "did not rise to the high threshold of extreme and outrageous conduct". 765 So.2d at 1029 n. 20. The Nicholas Court also noted that while the Nicholas plaintiff "genuinely felt humiliated, anxious, confused, upset and worried" as a result of the defendant's conduct, the plaintiff's emotional distress was not "more than a reasonable employee might be expected to endure in the workplace". 765 So.2d at 1030.
In the present case, Mr. Goldberg sued for alleged intentional infliction of emotional *1169 distress in connection with his termination by defendant Glazer Steel. Mr. Goldberg was an employee at will so his allegations concern, not his termination per se, but the manner of his termination.
Mr. Goldberg married Kim Glazer in 1984. Her father, Jerome S. Glazer, owned Glazer Steel in New Orleans. At the time of the marriage, Mr. Goldberg and Kim Glazer lived in New York City and he was in the clothing business. As of 1987, Mr. Goldberg's clothing businesses were suffering large losses. As a result, Mr. Goldberg liquidated his clothing businesses and moved to New Orleans and became employed as an executive of Glazer Steel in 1988. He had no prior experience in the steel business.
Glazer Steel was a small family owned and run steel service company. Jerome S. Glazer's nephew, defendant Jay Glazer, was president of Glazer Steel. While Jerome S. Glazer was still alive, he was the sole shareholder of Glazer Steel. Upon his death in April 1991, all shares of Glazer Steel became owned by his estate. The beneficiaries of the estate were Kim Glazer (25%), Jerome S. Glazer's son (25%) and the Jerome S. Glazer Foundation (50%), which was a charitable enterprise. The executor for the estate was defendant Alfred H. Moses, who was an attorney of the Washington, D.C. law firm Covington and Burling.
In May 1995, Kim Glazer's attorney wrote to Mr. Goldberg and said that she was filing for divorce. That letter was copied to Mr. Moses. Mr. Moses then asked Mr. Goldberg to meet with him. The trial court found that Mr. Moses' words and actions at and immediately following this meeting were the first of four instances of intentional infliction of emotional distress, so we will examine them in detail.
The meeting took place on June 2, 1995 in Mr. Moses' office in Washington, D.C. and lasted no more than half an hour. Only Mr. Goldberg and Mr. Moses were present. Mr. Goldberg secretly tape-recorded the meeting but lost the tape prior to trial. Mr. Goldberg also took notes of the meeting and they were introduced into evidence at trial. Mr. Moses discussed with Mr. Goldberg both his continued employment at Glazer Steel and his pending divorce from Kim Glazer. Mr. Moses determined that Mr. Goldberg wanted to remain at Glazer Steel. Mr. Moses then told Mr. Goldberg, in effect, that, in order for him to remain at Glazer Steel, he (1) needed to resolve the divorce proceeding amicably and (2) had to sign a non-competition agreement. Mr. Goldberg said that he would sign a non-competition agreement only if he were given an employment contract. That condition was unacceptable to Mr. Moses. Mr. Goldberg then walked out of the meeting. Mr. Moses followed Mr. Goldberg to the elevator and told him "you're through" at Glazer Steel.
Mr. Goldberg went to the public telephone in the lobby of the building in which Mr. Moses' office was located. He telephoned defendant Jay Glazer, the president of Glazer Steel, and made various threats of civil litigation and criminal charges against Glazer Steel. He also called Glazer Steel employees, asked for copies of customer lists, and said that Glazer Steel was going out of business. Once back in New Orleans, he called up a bank which had a loan to Glazer Steel and made allegations regarding Glazer Steel's credit.
Glazer Steel's board of directors voted to terminate Mr. Goldberg's employment. *1170 They also voted to grant him certain severance pay, insurance benefits and a car. When Jay Glazer told Mr. Goldberg of the board's actions, including the severance pay, etc., Mr. Goldberg replied with an obscenity directed at Mr. Moses. About a week later, the board voted to revoke the severance benefits for Mr. Goldberg due to the telephone calls he had made to Glazer Steel employees and to Glazer Steel's bank.
The trial court found that Mr. Moses' meeting with Mr. Goldberg and the board's actions afterward constituted actionable intentional infliction of emotional distress because they were an attempt to "pressure him into settling a domestic dispute while holding his job and livelihood in the balance". However, Glazer Steel was a small family-owned and family run business. The Company was owned by the estate of Jerome S. Glazer. Kim Glazer was 25% beneficiary of the estate and her brother and their family charitable foundation were beneficiaries of the other 75%. Kim Glazer's cousin, Jay Glazer, was the president of the company. Apparently, other family members were also employed there. It was not illegitimate for Mr. Moses, acting as executor for the estate which owned Glazer Steel, to have a concern that acrimony between Mr. Goldberg and Kim Glazer, while Mr. Goldberg was an executive of the company, could be detrimental to the company. Thus, his conditioning Mr. Goldberg's remaining with Glazer Steel upon an amicable resolution of the divorce was arguably justified and was certainly not outrageous.
Moreover, the issue over which the discussion between Mr. Goldberg and Mr. Moses broke down was not the divorce but, instead, Mr. Moses' insistence upon a non-competition agreement. Apparently, Mr. Moses was concerned that, with Mr. Goldberg alienated from the Glazer family by the divorce, Mr. Goldberg might, at an opportune time, desert the Glazer family business and use his position as an executive to facilitate taking customers with him. As Mr. Moses put it to Mr. Goldberg, he could not have Mr. Goldberg at Glazer Steel and not know where his loyalties lay. As the executor of the estate which owned Glazer Steel, this was a legitimate concern of Mr. Moses and, at the least, his insistence upon a non-competition agreement was certainly not outrageous.
The second set of acts which the trial court found to constitute intentional infliction of emotional distress was "Glazer Steel's failure to allow Mr. Goldberg access to his personal belongings at Glazer Steel's Office, their opening his personal mail and their telling persons who'd called for him that he'd moved back to New York".
The only "personal items" of Mr. Goldberg that the trial court found Glazer Steel to have retained were a rolodex and phone books that Mr. Goldberg used while at Glazer Steel. Glazer Steel and its counsel determined to retain these items on the ground that they contained proprietary information consisting of customer and vendor names. After Mr. Goldberg's telephone calls to Glazer Steel's employees, Glazer Steel had obtained a preliminary injunction against Mr. Goldberg using the company's proprietary information and Jay Glazer and the company's attorney believed that the company was entitled to retain the rolodex and the phone books pursuant to that preliminary injunction. The rolodex and phone books were sealed and placed in a secure location at Glazer Steel. Mr. Goldberg's counsel confirmed by letter to Glazer Steel's counsel an arrangement whereby certain items including *1171 the rolodex and phone books would remain sealed and secured until Mr. Goldberg had an opportunity for a contradictory hearing in the pending injunction action. However, apparently, Mr. Goldberg never set for hearing the issue of the rolodex and the phone books. Even assuming that Glazer Steel was not entitled to retain the rolodex and the phone books, Jay Glazer and the company's attorney acted in a reasonable manner, in coordination with Mr. Goldberg's counsel, to maintain the status quo, consistent with Glazer Steel's preliminary injunction against Mr. Goldberg, until the court in the injunction action decided the issue. The fact that the issue was never brought before the court in the injunction action, so that the rolodex and phone books remained at Glazer Steel, is no more attributable to Glazer Steel than it is attributable to Mr. Goldberg. The defendants conduct was certainly not outrageous with respect to the rolodex and the phone books.
As to the opening of Mr. Goldberg's personal mail, Jay Glazer testified as to certain procedures adopted, upon the advice of counsel, with respect to mail received at Glazer Steel and addressed to Mr. Goldberg. Mail that was addressed to both Mr. Goldberg and Kim Glazer was opened and copies were made for both parties. Mail that was addressed to Mr. Goldberg and Glazer Steel was opened and, if it was in fact personal, it was forwarded to Mr. Goldberg's counsel. The trial court found that Mr. Goldberg ultimately got all of his mail. Glazer Steel's conduct with respect to the mail was not unreasonable. Because Mr. Goldberg had been an executive of Glazer Steel, mail would have been addressed to him at the office which was, in fact, the company's business. Also, upon his termination, Mr. Goldberg could have advised his personal correspondents to write to him at some other address. In short, the defendants did nothing outrageous with respect to Mr. Goldberg's mail.
The finding that Glazer Steel told people that Mr. Goldberg had moved back to New York was based upon a single incident. One of Mr. Goldberg's friends, Michael Frank, called Glazer Steel, asked for Mr. Goldberg, and was told by some unknown person, perhaps a receptionist, that he had moved back to New York. We do not think that this single incident, even assuming it was intentional rather than a simple error, meets the very high standards of Nicholas as to what is so outrageous as to constitute actionable conduct.
The third set of facts which the trial court found to constitute actionable conduct involved funds of Mr. Goldberg's in the Glazer Steel pension plan. Mr. Goldberg's attorney wrote to Glazer Steel and demanded the funds. Glazer Steel's accountant wrote back and explained that, under the pension plan, Mr. Goldberg was not yet entitled to receive the funds. He also sent to Mr. Goldberg's attorney a copy of the pension plan. Mr. Goldberg demanded that a review board be convened as to his request for the funds but, although he was entitled to such a review board, it was never convened. This conduct of Glazer Steel was not extreme and outrageous within the meaning of Nicholas even if Glazer Steel acted improperly in failing to convene a review board. For one thing, the trial court never found that Glazer Steel's accountant was incorrect in his determination that Mr. Goldberg was not yet entitled to the pension funds and it appears to us that, because Mr. Goldberg had not yet reached the retirement age prescribed by the pension plan, the accountant *1172 was correct. Moreover, this was a purely pecuniary dispute, involving the terms of a legal instrument, handled by attorneys and accountants. This sort of financial/contractual dispute does not fit easily into the Nicholas decision's paradigm of extreme and outrageous conduct. It is the sort of dispute which is commonplace in business dealings.
Eventually, the Glazer Steel pension plan was terminated and, as a result, funds were distributed to plan beneficiaries, including Mr. Goldberg. The trial court found that Glazer Steel deliberately delayed in notifying Mr. Goldberg that he would be receiving funds from the pension plan. However, the trial court did not find that Glazer Steel was subject to any legal or contractual deadline for notifying Mr. Goldberg of the pension plan termination and planned distribution of funds. In any event, we do not believe that the delay in notifying Mr. Goldberg, even if wrongful meets the Nicholas decision's stringent standard of "extreme and outrageous" conduct necessary for the tort of intentional infliction of emotional distress.
The fourth, and last, set of facts which the trial court found to be actionable involved some football tickets. Apparently, the tickets were purchased with Glazer Steel funds and Glazer Steel believed that they were in Mr. Goldberg's possession. Glazer Steel's attorney wrote to Mr. Goldberg's attorney and demanded that the tickets be returned and threatened legal action if they were not returned. The trial court found that, in fact, Mr. Goldberg had left the tickets at Glazer Steel. This was a small dispute and was handled entirely through the parties' respective attorneys. It was not of sufficient magnitude to meet the "extreme and outrageous" standard of Nicholas. Moreover, even if Glazer Steel was wrong in stating that Mr. Goldberg had the tickets, it handled the matter in a professional manner by having its attorney write to Mr. Goldberg's attorney. Thus, Glazer Steel's conduct was not outrageous.
For the foregoing reasons, the judgment of the trial court is reversed and we render judgment dismissing the case.
REVERSED AND RENDERED.